Exhibit N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

CAROLYN M. KIEFFABER and    )
THOMAS M. KIEFFABER,        )
                            )
    *Plaintiffs*,        )       Civil Action No. 6:20-cv-01177-KHV-JPO
                            )
v.                          )
                            )
ETHICON, INC., ET AL.,      )
                            )
    *Defendants*.        )
                            )

## DEFENDANTS' MOTION IN LIMINE NO. 14 TO EXCLUDE EVIDENCE OF PLAINTIFFS' ALLEGATIONS OF SPOLIATION

        Plaintiffs seek to present testimony and argument at trial regarding baseless allegations that Ethicon failed to retain certain employees' documents in violation of its discovery obligations in this litigation. During the parties' discussion of prior spoliation motions in limine at the last pretrial hearing, Plaintiffs incorrectly represented to this Court that they have "won [the spoliation issue] the last few times." (Pretrial Tr. ("*Kieffaber* Pretrial Tr.") 27:10-22 (Feb. 22, 2021) (attached as Ex. 5).) That is not true. [1] Throughout the course of the mesh litigation, plaintiffs have

---

[1]     Plaintiffs are apparently relying on two aberrational decisions that were decided pursuant to Pennsylvania and New Jersey state law (*Hammons* and *Hrymoc*). Neither decision held or suggested that any plaintiff's spoliation allegations should be admitted in any other pelvic mesh trial; rather, they were limited to the factual circumstances of those cases. *See Hammons v. Ethicon, Inc.*, 190 A.3d 1248, 1282-83 (Pa. Super. Ct. 2018) (affirming decision), *review granted in part, denied in part*, 206 A.3d 495 (Pa. 2019) (per curiam), *aff'd*, 240 A.3d 537 (Pa. 2020); Order at 10-16, *Hrymoc v. Ethicon, Inc.*, No. BER-L-013696-14 (N.J. Super. Ct. Law Div. Nov. 3, 2017) (allowing very limited evidence regarding Ethicon's accidental loss of documents) (attached as Ex. 6). Moreover, both decisions are against the better and overwhelming weight of authority on this issue. In fact, following the *Hammons* decision, Pennsylvania state courts have excluded evidence regarding the loss of documents from every subsequent pelvic mesh trial. *See supra* n.4.

*(cont'd)*

repeatedly attempted to inject these allegations into trials, and court after court has rejected this effort as a sideshow that has no place in a product-liability trial.  The federal multidistrict litigation ("MDL") court from which this case was remanded has already considered these spoliation allegations and rejected multiple plaintiffs' motions for litigation sanctions,[2] as well as efforts by individual plaintiffs to introduce spoliation-related evidence at trial in more than 60 cases.[3]  In addition, a number of state courts in Pennsylvania,[4] as well as state courts in Texas and Missouri,[5] have excluded this evidence. Defendants respectfully urge this Court to do the same for the following reasons.

*First*, this evidence has zero relevance to the merits of Plaintiffs' claims, would result in unnecessary and time-consuming mini-trials and would prejudice and confuse jurors.

---

[2]   *See In re Ethicon*, *Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 507 (S.D. W. Va. 2014).

[3]   *See, e.g.*, *Bellew v. Ethicon, Inc.*, No. 2:13-cv-22473, 2014 WL 6680356, at *3-4 (S.D. W. Va. Nov. 25, 2014); *Huskey v. Ethicon, Inc.*, No. 2:12-cv-05201, 2014 WL 3861778, at *5-6 (S.D. W. Va. Aug. 6, 2014); *Edwards v. Ethicon, Inc.*, No. 2:12-CV-09972, 2014 WL 3882186, at *5-6 (S.D. W. Va. Aug. 7, 2014); Order at 1, *Lewis v. Johnson & Johnson*, No. 2:12-cv-04301, ECF No. 277 (S.D. W. Va. Feb. 13, 2014) (attached as Ex. 1); *Daino v. Ethicon, Inc.*, No. 2:12-cv-1145, 2017 WL 459867, at *2 (S.D. W. Va. Feb. 2, 2017).

[4]   *See* Order at 1, *Mesigian v. Ethicon, Inc.*, Feb. Term 2014, No. 0399 (Pa. Ct. Com. Pl. Phila. Cty. Apr. 8, 2019); Order at 1, *Emmet v. Ethicon, Inc.*, July Term 2013, No. 1495 (Pa. Ct. Com. Pl. Phila. Cty. Nov. 21, 2018); Order at 1, *Adkins v. Ethicon, Inc.*, July Term 2013, No. 00919 (Pa. Ct. Com. Pl. Phila. Cty. May 19, 2017); Order at 1, *Beltz v. Ethicon, Inc.*, June Term 2013, No. 3835 (Pa. Ct. Com. Pl. Phila. Cty. May 3, 2017); Trial Tr. 27:13-15, *Engleman v. Ethicon, Inc.*, Mar. Term 2014, No. 05384 (Pa. Ct. Com. Pl. Phila. Cty. Apr. 7, 2017); Order at 1, *Blockus v. Ethicon, Inc.*, July Term 2013, No. 707 (Pa. Ct. Com. Pl. Phila. Cty. Feb. 2, 2017); Order at 1, *Carlino v. Ethicon, Inc.*, June Term 2013, No. 03470 (Pa. Ct. Com. Pl. Phila. Cty. Jan. 25, 2016) (attached collectively as Ex. 2).

[5]   *See* Electronic Notice of Entry ("*Budke* Entry") at 1-2, *Budke v. Lake Area Womens Ctr. of OBGYN*, No. 10CM-CC00085 (Mo. Cir. Ct. Camden Cty. Nov. 19, 2014) (attached as Ex. 3); Trial Tr. 58:1-8, *Batiste v. McNabb*, No. DC-12-14350 (Tex. Dist. Ct. Dall. Cty. Mar. 25, 2014) (refusing to allow testimony regarding spoliation at trial) (attached as Ex. 4).

**Second**, Federal Rule of Civil Procedure 37 is clear that evidence and argument to the jury regarding the loss of electronic materials may only come into trial as a sanction where the destruction of materials has interfered with an adversary's ability to present his or her case. The MDL court overseeing Ethicon pelvic mesh litigation specifically held – after significant briefing and a hearing on the issue – that there was no evidence that Ethicon's inadvertent loss of certain documents would prejudice the MDL plaintiffs' ability to prove their claims. Plaintiffs themselves frequently note that millions of documents have been produced in this litigation. Thus, this is hardly a case in which Plaintiffs' prosecution of their claims has been hampered by the absence of evidence.

To be clear, Ethicon has not taken Plaintiffs' allegations of spoliation lightly. The Company has thoroughly investigated claims of spoliation, and since the document loss was discovered, it has instituted additional rigorous policies to minimize the risk of retention issues arising in the future. But the fact that some Ethicon employees made inadvertent mistakes with respect to document retention is not a basis to taint the upcoming trial with spoliation allegations. This trial should be about whether the Prolift product at issue is defective and whether the product caused the specific injuries alleged by Plaintiffs. Injecting spoliation evidence into Plaintiffs' presentation to the jury would overshadow the trial, confuse the jurors, and distract them from making those critical determinations. For these reasons, discussed further below, Defendants' motion to exclude spoliation evidence should be granted. [6]

---

[6]    Defendants respectfully submit that oral argument would be appropriate in this case, given the highly prejudicial nature of the evidence at issue.

## BACKGROUND

Ethicon has had in place, at all relevant times, a written procedure for preserving documents subject to legal holds when employees leave the Company.  Pursuant to Company policies, departing employees' managers are responsible for instructing the employees to review their "electronic files against any Preservation Notices in effect."  Decl. of James P. Mittenthal ("Mittenthal Decl.") ¶ 51, *Adkins v. Ethicon, Inc.*, July Term 2013, No. 00919 (Pa. Ct. Com. Pl. Phila. Cty. May 15, 2017) (attached as Ex. 7).  Departing employees are also responsible for working with their managers to complete an "Exit Checklist & Certificate of Compliance For Records Disposition" prior to leaving the Company, which instructs employees to preserve any documents that have been retained for litigation.  *Id.*  The departing employees' managers are required to identify to the Company's information technology ("IT") representatives which computer files are relevant to pending litigation and should be preserved.  *Id.*  The Company's IT department is then responsible for transferring the identified electronic files to a CD before repurposing the employee's hard drive.  *Id.*

Ethicon has also established "robust policies, schedules, and procedures governing retention that apply even in the absence of litigation."  *Id.* ¶ 21; *see also* Decl. of Lisa Kaiser ¶¶ 4-5, *In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2327 (S.D. W. Va. Jan. 9, 2014) (attached as Ex. 8).  Pursuant to these policies, Ethicon retains the core documents related to its products, including, but not limited to, "DHFs [(design history files)], laboratory notebooks, technical reports, labeling content, and FDA submissions."  Mittenthal Decl. ¶ 23.

Despite the document retention and litigation hold policies outlined above, attorneys for Ethicon discovered in Spring 2013 that – due to an inadvertent oversight – electronic documents belonging to certain former employees that were subject to legal holds were not retained upon the

employees' departure from the Company. *See id.* ¶¶ 53-55. Ethicon immediately raised the issue with plaintiffs in the MDL and asked James Mittenthal, its retained Rule 30(b)(6) representative regarding records retention and e-discovery efforts, to conduct an investigation into the issue. Following his investigation, Mr. Mittenthal concluded that for most of the former employees at issue, "the employee understood and properly preserved documents while working at Ethicon," but electronic files were nonetheless lost because "upon the employee's departure or separation from the company, his or her electronic data were not properly transferred . . . [and] the contents of the employee's hard drive were not preserved." *Id.* ¶ 55. According to Mr. Mittenthal, this occurred because of a misunderstanding on the part of either the employee, who "assumed" everything on his or her hard drive would be preserved and failed to identify relevant materials for his or her manager, or the manager, who did not communicate to IT personnel that certain materials on the employee's hard drive needed to be preserved. *Id.* Mr. Mittenthal also noted that in other "rare circumstances," electronic data were lost "because the former employee misunderstood the requirements to preserve documents, notwithstanding the litigation hold notices issued." *Id.*; *see also* Decl. of Phu Dao ¶ 7, *In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2327 (S.D. W. Va. Jan. 8, 2014) (attached as Ex. 9) (sworn statement that individual responsible for overseeing IT support for Ethicon was "not aware of anyone [involved in Ethicon's IT department] having intentionally deleted or destroyed any data that was known at that time to be relevant to the Ethicon pelvic mesh litigation").

Plaintiffs in the MDL then raised the issue with that court in late 2013 by filing a motion for a finding of spoliation and for spoliation sanctions, including the issuance of an adverse-inference instruction in federal pelvic mesh trials. *See In re Ethicon*, 299 F.R.D. at 507. Based on a thorough examination of the history of the litigation and the facts at issue – which are the same

facts applicable here – MDL Magistrate Judge Cheryl Eifert issued an 18-page opinion rejecting any trial sanctions based on the loss of these materials. *See id.* According to Judge Eifert, the **earliest** time when Ethicon could possibly have had a duty to preserve evidence was April 21, 2008 for evidence related to Prolift, and therefore the loss of documents before that date could not be considered spoliation. *Id.* at 516-19. Further, the MDL court noted that the record does not support a finding that Ethicon, or any employee of Ethicon, "acted willfully or in bad faith," and "certainly there is no proof that Ethicon destroyed evidence specifically for the purpose of preventing its disclosure in this litigation." *Id*. at 519, 521. To the contrary, as the MDL court recognized, "the record indicates that employees aware of litigation holds took steps to collect, segregate, and save relevant information," and "when evidence was destroyed, it usually occurred when an employee left Ethicon, and generally was deleted by a technician in the information technology department who had no knowledge that he or she was destroying material evidence." *Id.* at 521.

Judge Eifert also found that the MDL plaintiffs had failed to establish any "specific gaps or weaknesses in their cases that exist *because* critical evidence was lost or destroyed." *Id.* at 526. This was so because the documents critical to the plaintiffs' product-liability claims, "including materials relating to product design, regulatory affairs, marketing, adverse events and complaints, and post-market surveillance," were "centrally maintained at Ethicon" and therefore were not lost when employees left the Company. *Id.* at 523. Instead, the materials that were discarded consisted largely of emails and "other incidental records," which are "generally not necessary to prove most product liability claims," and, in any event, had largely been produced from other employees' files. *Id.* at 526.

As noted above, in response to the MDL plaintiffs' repeated attempts to revisit the issue and seek admission of spoliation evidence into trials, the MDL court has since issued a number of rulings excluding spoliation evidence from MDL bellwether trials.

**ARGUMENT**

Evidence related to any allegation that Ethicon has engaged in the spoliation of evidence is not admissible because:  (1) it is utterly irrelevant; (2) its admission would be highly prejudicial; and (3) Plaintiffs have not demonstrated any entitlement to trial sanctions.

**I.   EVIDENCE RELATED TO ETHICON'S INADVERTENT LOSS OF DOCUMENTS WOULD BE IRRELEVANT AND HIGHLY PREJUDICIAL.**

Evidence related to Plaintiffs' allegations of spoliation should be excluded under Rules 401 and 403 because it is both irrelevant and extremely prejudicial.  As the MDL court has recognized, such evidence is not relevant to the liability issues implicated by mesh plaintiffs' cases, particularly because the MDL court has found that Ethicon's inadvertent loss of documents was "not willful or deliberate."  *See, e.g.*, *Huskey*, 2014 WL 3861778, at *5, *6.  Moreover, the evidence is highly prejudicial because its admission at trial would result in significant prejudice, jury confusion and a costly diversion of time and resources.  *See, e.g.*, Pretrial Tr. ("*Mesigian* Tr.") 144:8-11, *Mesigian v. Ethicon, Inc.*, Feb. Term 2014, No. 0399 (Pa. Ct. Com. Pl. Phila. Cty. Apr. 8, 2019) (excluding evidence pertaining to Ethicon's alleged spoliation because the "danger of unfair prejudice, juror confusion, and undue delay" "outweigh[ed] the minimal relevance") (attached as Ex. 10).

*First*, evidence regarding Ethicon's alleged failure to retain certain documents is irrelevant because it does not have a "tendency to make a fact" that is "of consequence in determining the action" more or less probable than it would be without the evidence.  Fed. R. Evid. 401.  The central issues in this case are whether Ethicon's Prolift product is defective; whether Ethicon's Prolift product caused Plaintiffs' alleged injuries; whether Ethicon failed to adequately warn about

7

the supposed risks posed by the product; and whether Ethicon breached any duty to Ms. Kieffaber in designing and warning about the product.  Evidence regarding a discovery dispute between the parties is not probative of any of those issues.  *See, e.g.*, *Dahlberg v. MCT Transp., LLC*, No. CIV 11-203 RHS/LFG, 2012 WL 12864178, at *2 (D.N.M. May 10, 2012) (concluding "that lost . . . data is not relevant to [p]laintiff's claim as defined by Rule 401, and because it is not relevant, it will be excluded from the jury"); *Waters v. Genesis Health Ventures, Inc.*, 400 F. Supp. 2d 814, 818 (E.D. Pa. 2005) (excluding evidence related to discovery disputes as "entirely irrelevant" to plaintiff's claim and holding that "[a]rguments by either side about the completeness of the production of documents will not be tolerated"); *see also Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 26 (Tex. 2014) ("[E]vidence bearing solely on whether a party spoliated evidence" "often has no bearing on the facts that are 'of consequence to the determination of the action' from the jury's perspective.") (citation omitted).

**Second**, evidence related to Plaintiffs' spoliation allegations should also be excluded under Rule 403 because it would be unfairly prejudicial and unnecessarily confusing.  *See Mesigian* Tr. 144:8-11 (excluding evidence pertaining to Ethicon's alleged spoliation because the "danger of unfair prejudice, juror confusion, and undue delay" "outweigh[ed] the minimal relevance").  Plaintiffs' only purpose in presenting evidence regarding spoliation allegations would be an improper one:  to unfairly prejudice the jury by insinuating that Ethicon acted improperly or had something to hide, a claim that the MDL court rejected.  *In re Ethicon*, 299 F.R.D. at 507.  As one court noted in excluding evidence of purported discovery violations, "[e]ven if some inference of consciousness of wrongdoing could be drawn from the manner in which defendant responded to plaintiff's discovery requests in this case . . . the unfair prejudice that defendant would suffer from the admission of the evidence would clearly outweigh its probative value."  *Green v. Baca*, 226

F.R.D. 624, 643 (C.D. Cal. 2005); *see also Hinkle v. Ford Motor Co.*, No. 3:11-24-DCR, 2012 WL 4049477, at *6 (E.D. Ky. Sept. 13, 2012) ("[I]t would not be proper to present arguments, statements, or evidence to the jury regarding discovery disputes.").

Evidence regarding Plaintiffs' spoliation allegations would also create substantial confusion, prejudice and delay.  By presenting evidence and argument regarding Ethicon's alleged spoliation, Plaintiffs would essentially derail the trial by requiring the presentation of complex testimony about legal and discovery issues, including technical discussions about when Ethicon's duty to preserve documents related to this case arose, Ethicon's document retention policies and implementations of legal holds, Ethicon employees' training and understanding of their obligations under those policies and holds and the specific reasons why certain documents may not have been retained.  Such a "trial within a trial" on the issue of Plaintiffs' spoliation allegations (without any initial finding from this Court that spoliation occurred, much less that it justifies trial sanctions) would almost certainly distract and confuse jurors who are not versed in discovery issues or a party's discovery obligations – and would unfairly prejudice them against Ethicon.  *See Budke* Entry at 2 ("[A]llowing an argument as to spoliation tends to inject an inquiry that would require a trial within a trial, i.e., a mini trial, which would use valuable time . . . ."); Pretrial Tr. 183:9-12, *Batiste v. McNabb*, No. DC-12-14350 (Tex. Dist. Ct. Dall. Cty. Mar. 12, 2014) (attached as Ex. 11) ("I do not intend to permit a mini trial about whether or not the defendant spoliated documents . . . ."); *see also Thompson v. Glenmede Trust Co.*, No. CIV. A. 92-5233, 1996 WL 529693, at *2 (E.D. Pa. Sept. 17, 1996) (excluding evidence related to discovery disputes due to risk that "the jury may . . . be misled by the irrelevant side issues of the discovery process," "[r]ather than focus on the issues in the case"); *Brookshire Bros.*, 438 S.W.3d at 26 ("[T]he tendency of [spoliation]

evidence to skew the focus of the trial from the merits to the conduct of the spoliating party raises a significant risk of both prejudice and confusion of the issues.").

In short, evidence regarding spoliation is not only irrelevant to product-liability claims, but also highly prejudicial. Plaintiffs' intent in seeking to introduce such evidence is to create a cloud of document loss that will hang over every issue in this trial, even though multiple courts have concluded that Ethicon did not act with any intent to destroy evidence and that Plaintiffs have all the documents they need to present their case. For these reasons, the evidence should be excluded from trial.

## II.   EVIDENCE RELATED TO ETHICON'S INADVERTENT LOSS OF DOCUMENTS SHOULD NOT BE ADMITTED BECAUSE ADMISSION OF SUCH EVIDENCE WOULD CONSTITUTE A TRIAL SANCTION.

Because evidence related to Plaintiffs' spoliation allegations is inadmissible under Rules 401 and 403, Plaintiffs' request to admit this evidence at trial effectively amounts to a motion for sanctions. No such motion has been filed, which is reason enough to deny any such request. But even if Plaintiffs had filed a motion for sanctions, it would be meritless because Plaintiffs cannot demonstrate two elements necessary for such relief: (1) a duty to disclose; and (2) prejudice from the loss of documents.[7] *See Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. SAG-18-3403, 2020 WL 1809191, at *4 (D. Md. Apr. 9, 2020) ("Rule 37(e)(1) provides that, when the [c]ourt finds that a party suffered prejudice from the loss of ESI that another party had a duty to preserve but failed to take reasonable steps to preserve, and the ESI is not otherwise available, then the [c]ourt 'may order measures no greater than necessary to cure the prejudice.'") (quoting

---

[7]   Although Ethicon summarizes below why sanctions would be inappropriate, it reserves the right to oppose a motion for sanctions if one is filed, as well as any request for an adverse inference, which some plaintiffs have sought in similar cases.

Fed. R. Civ. P. 37(e)(1)); *see also Philmar Dairy, LLC v. Armstrong Farms*, No. 18-cv-0530 SMV/KRS, 2019 WL 3037875, at *2 (D.N.M. July 11, 2019) ("The [c]ourt must [first] determine whether [d]efendants failed to preserve ESI that should have been preserved in anticipation of litigation."); Fed. R. Civ. P. 37(e) ("If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it," the court, "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice . . . .").

    ***First***, the inadvertent loss of documents primarily occurred before Ethicon incurred a duty to preserve documents for pelvic mesh litigation.  "A litigant has a duty to preserve evidence that it knows or should know is relevant to imminent or ongoing litigation . . . ."  *Stovall v. Brykan Legends, LLC*, No. 17-2412-JWL, 2019 WL 480559, at *2 (D. Kan. Feb. 7, 2019) (citation omitted); *Philmar Dairy, LLC*, 2019 WL 3037875, at *5 (declining to issue sanctions pursuant to Rule 37 because "[p]laintiffs fail[ed] to establish that [d]efendants reasonably anticipated litigation at the time" the evidence was lost); *Cook v. Olathe Health Sys., Inc.*, No. 10-CV-2133-KHV-DJW, 2011 WL 346089, at *5 (D. Kan. Feb. 2, 2011) (denying plaintiff's "spoliation motions on the grounds that [p]laintiff has not demonstrated that [d]efendants had an obligation to preserve the [evidence] at the time the evidence was destroyed").

    The MDL court has already thoroughly examined this issue and concluded that the ***earliest*** date on which Ethicon should have anticipated large-scale litigation giving rise to widespread preservation measures was April 21, 2008 for its Prolift mesh products.  *See In re Ethicon*, 299 F.R.D. at 517.  Plaintiffs have not and cannot raise any facts or allegations that would support altering the conclusion that April 2008 is the earliest date on which a duty to preserve could have arisen for the Prolift product.

The 2008 trigger date precludes sanctions because a significant portion of the materials at issue was lost prior to the issuance of the 2008 legal hold.  For example, Plaintiffs have complained that "there w[ere] laptops of very important witnesses . . . which were destroyed and not preserved" (*Kieffaber* Pretrial Tr. 24:19-22), but those losses generally occurred prior to 2008, *see, e.g.*, Mittenthal Decl. ¶ 63 (noting employees who left Ethicon prior to any duty to preserve).

**Second**, any request for spoliation sanctions would be unwarranted because there is no evidence that the accidental loss of documents has hindered Plaintiffs' ability to try their case.  "To be entitled to sanctions for spoliation," a party "must establish that it is actually, rather than theoretically, prejudiced by the failure to preserve documents."  *Energy Consumption Auditing Servs., LLC v. Brightergy, LLC*, No. 13-2588-CM-KGG, 2014 WL 12834854, at *3 (D. Kan. Dec. 2, 2014); *see also* Fed. R. Civ. P. 37(e) ("If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it," the court, "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice . . . ."); *AKH Co. v. Universal Underwriters Ins. Co.*, No. 13-2003-JAR-KGG, 2016 WL 4245474, at *5 (D. Kan. Aug. 11, 2016) (holding spoliation sanctions were unwarranted because "there is no evidence that . . . the [p]laintiff has been prejudiced by improper conduct concerning these particular documents").  In determining whether prejudice exists, courts consider whether the destroyed evidence was cumulative of other competent evidence that a party can use in place of the destroyed evidence, and whether the lost evidence was central to the issues in the case.  *See, e.g.*, *PTSI, Inc. v. Haley*, 71 A.3d 304, 318 (Pa. Super. Ct. 2013) (spoliation sanctions inappropriate where the "electronically stored information at issue was not the center of importance to the [c]ourt's

adjudication" and where "substantially similar information was available from other eDiscovery custodians and other sources with less burden and difficulty").

As Mr. Mittenthal has explained, all documents pertaining to the key subjects at issue in pelvic mesh cases – including regulatory compliance, marketing and sales – are maintained centrally at Ethicon, not in individual employees' files, and have already been produced to Plaintiffs. *See* Mittenthal Decl. ¶ 90. Thus, Plaintiffs cannot dispute that their personal injury claims will turn on evidence that is already in their possession. Further, as the MDL court noted, Ethicon "has produced voluminous documents and communications involving all of the relevant custodians," separate and apart from the documents that were inadvertently lost. *In re Ethicon*, 299 F.R.D. at 523. Specifically, Ethicon has produced more than 28 million pages of documents from more than 500 custodians and more than 300 non-custodian sources, including documents related to product design, research, clinical studies, regulatory matters, complaints, marketing and countless other subject matters. Moreover, to the extent documents were lost that have not been produced from other sources, they consisted primarily of emails, which are "generally not necessary to prove most product liability claims." *Id.* at 526. Thus, the MDL court found that the plaintiffs could not point to "any concrete evidence of prejudice" resulting from the loss of documents alleged. *Id.* at 524; *see also id.* at 507 ("the court finds that . . . [p]laintiffs have failed to establish a resulting prejudice").

In connection with another dispute between the parties, Plaintiffs argued that they have been prejudiced by the inadvertent loss of documents (*see* Doc. 198), but all of Plaintiffs' examples of prejudice have already been rejected by Judge Eifert, as Plaintiffs conceded (*see id.* at 15-16 (describing evidence and argument considered by the MDL court)). Moreover, some examples Plaintiffs provided ***do not even relate to the Prolift product implanted in Ms. Kieffaber***. For

example, Plaintiffs contended that Ethicon "destroyed 600 pounds of boxes containing files from Medscand, the company that developed the TVT." (*Id.* at 15.) But this case is about Prolift, not TVT, and Plaintiffs are unable to identify ***any*** missing data for the Prolift product. Similarly, the clinical data Plaintiffs claim is missing also pertains to the TVT product, and not Prolift. *See* Decl. of Pamela Downs ¶¶ 10-12, *In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2327 (S.D. W. Va. Jan. 9, 2014) (attached as Ex. 12). In any event, Ethicon has produced tens of thousands of pages of clinical data from TVT studies. *Id.* ¶ 13.

The other examples Plaintiffs have raised similarly fail to support their claim of prejudice. For example, Plaintiffs' assertion that the loss of Renee Selman's files has prejudiced their ability to try their claims makes no sense. (*See* Doc. 198 at 2, 15.) Ethicon has produced thousands of Ms. Selman's documents, including emails, from other employees' files. *See* Mittenthal Decl. ¶ 70. Moreover, Ms. Selman has already testified that she would not have been the author of the types of documents Plaintiffs hypothesize would have been in her file. *See id.* ¶ 85(a).[8]

In short, like the plaintiffs in the MDL proceeding, Plaintiffs here have not identified a single lost document or communication whose absence has hindered their ability to advance their product-liability claims against Ethicon; nor could they.[9] For this reason too, evidence regarding spoliation should be excluded from trial.

---

[8]    Other examples provided by Plaintiffs similarly do not support any claim of prejudice. (Doc. 189 at 15-16.) Ethicon has produced thousands of documents from Mr. Mahmoud, Ms. Paine and Mr. St. Hilaire, including emails, from other employees' files. *See* Mittenthal Decl. ¶ 70.

[9]    Ethicon's inadvertent failure to retain a small portion of "incidental" documents, which are "generally not necessary to prove most product liability claims," *In re Ethicon*, 299 F.R.D. at 526, out of the millions of emails generated and produced regarding Prolift is in stark contrast to Plaintiffs' destruction of the key piece of tangible evidence in this case – the actual mesh that was explanted from Ms. Kieffaber. (*See* Doc. 189.)

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter an order barring evidence or argument related to Plaintiffs' spoliation allegations.

Dated:  March 8, 2021

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Bryan M. Mouber
Bryan M. Mouber KS # 19710
Haley A. Phillips KS #28135
BAKER STERCHI COWDEN & RICE L.L.C.
2400 Pershing Road, Suite 500
Kansas City, MO 64108
Telephone: (816) 471-2121
Facsimile: (816) 472-0288
mouber@bscr-law.com
hphillips@bscr-law.com

Matthew P. Smith (admitted *pro hac vice*)
Butler Snow LLP
The Pinnacle at Symphony Place, 150 3rd
Avenue South, Suite 1600
Nashville, TN 37201
(615) 651-6796
(615) 651-6701 (Fax)
Matt.Smith@butlersnow.com

Kimberly Gustafson Bueno (admitted *pro hac vice*)
Butler Snow LLP
1400 Lavaca Street, Suite 1000
Austin, TX 78701
(737) 802-1800
(737) 802-1801 (fax)
Kim.bueno@butlersnow.com

Philip J. Combs (admitted *pro hac vice*)
Thomas Combs & Spann, PLLC
300 Summers Street, Suite 1380
Charleston, WV 25301
(304) 414-1805
(304) 414-1801 (fax)
pcombs@tcspllc.com

</div>

**ATTORNEYS FOR DEFENDANTS
ETHICON, INC. and JOHNSON & JOHNSON**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of March, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system which will send notification to all counsel of record.

<div style="text-align:center">

/s/ Bryan M. Mouber
Attorney for Defendants

</div>

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

CAROLYN LEWIS,

                Plaintiff,

v.                                CIVIL ACTION NO.   2:12-cv-04301

JOHNSON & JOHNSON, et al.,

                Defendants.

### ORDER

Pending before the court are the Defendants' Motion to Exclude References to the Alleged Loss of Medscand Materials [Docket 273] and the Defendants' Motion to Exclude Evidence and Argument Related to the Plaintiffs' Spoliation Allegations [Docket 276]. It is **ORDERED** that the motions are **GRANTED** for the reasons I discussed on the record during the fourth day of trial in this matter.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                           ENTER:    February 13, 2014

                           JOSEPH R. GOODWIN
                           UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

| | |
|---|---|
| *IN RE: PELVIC MESH LITIGATION* | **PHILADELPHIA COUNTY** |
| | **COURT OF COMMON PLEAS** |
| Patricia Mesigian, et al., | **TRIAL DIVISION** |
| Plaintiff, | |
| v. | **FEBRUARY TERM, 2014** |
| | **No. 0399** |
| Ethicon, Inc., et al., | |
| Defendants. | |

**ORDER**

AND NOW, this ___8th___ of ___April___ 2019, upon consideration of Defendants' Motion *in*

*Limine* No. 5 to Exclude Evidence of Plaintiffs' Allegations of Spoliation, and the response by

Plaintiffs, if any, it is hereby **ORDERED** that Defendants' Motion is **GRANTED.**

BY THE COURT:

_____ J.

Mesigian Etal Vs Ethico-ORDER

14020039900196

DOCKETED
COMPLEX LIT CENTER

APR 9   2019

J. STEWART

Case ID: 140200399
Control No.: 19030597

| | |
|---|---|
| *IN RE PELVIC MESH LITIGATION* | **PHILADELPHIA COUNTY** |
| | **COURT OF COMMON PLEAS** |
| Suzanne Emmet, et al. | **TRIAL DIVISION** |
| Plaintiffs, | |
| | **JULY TERM 2013** |
| v. | **NO. 1495** |
| Ethicon, Inc., et al., | |
| Defendants. | |

**ORDER**

AND NOW, this ⟨20th⟩ of ⟨Nov⟩ 2018, upon consideration of Defendants' Motion *in*

*Limine* No. 11 to Exclude Evidence of Plaintiffs' Allegations of Spoliation, and the response by

Plaintiffs, if any, it is hereby **ORDERED** that Defendants' Motion is **GRANTED**.

BY THE COURT:

_____

Kenneth J Povell Jr

Emmett Etal Vs Ethicon -ORDER



13070149500323

DOCKETED
COMPLEX LIT CENTER

NOV 2 1 2018

J. STEWART

Case ID: 130701495

Control No.: 18102144

| | |
|---|---|
| KIMBERLY L. ADKINS, Plaintiff | COURT OF COMMON PLEAS |
| | PHILADELPHIA COUNTY |
| v. | JULY TERM, 2013 |
| | No. 00919 |
| ETHICON, INC., et al., Defendants | |

## ORDER

And Now, this 19th day of May, 2017, upon consideration of Defendants, Ethicon, Inc. and Johnson & Johnson's, Motion *In Limine* to Exclude Evidence of Plaintiff's Allegations of Spoliation, it is hereby **ORDERED** and **DECREED** that Defendant's Motion is **GRANTED**.

**BY THE COURT**:

_____

**Honorable Judge Michael E. Erdos**

DOCKETED
COMPLEX LIT CENTER

MAY 2 4 2017

J. STEWART

Adkins Vs Johnson & Joh-ORDER

13070091900203

Case #: 130700919
Control #: 17042810

| | |
|---|---|
| *IN RE: PELVIC MESH LITIGATION* | **PHILADELPHIA COUNTY** |
| | **COURT OF COMMON PLEAS** |
| Sharon Beltz, et al. | **TRIAL DIVISION-CIVIL** |
|       Plaintiffs, | |
| | **JUNE TERM 2013** |
|    v. | **NO. 3835** |
| Ethicon, Inc., et al. | |
|       Defendants. | **CONTROL NO.** |

**ORDER**

AND NOW, this _____ 3rd _____ of _____ MAY _____ 2016, upon

consideration of Defendant's Motion *in Limine* No. 12 to Exclude Evidence of Plaintiffs'

Allegations of Spoliation, and the response of Plaintiffs, if any, it is hereby ORDERED that

Defendants' Motion is GRANTED. *This order does not preclude Plaintiff from requesting other remedies.*

By the Court:

_____ J.

2

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION
- - -

MARGARET ENGLEMAN          :MARCH TERM 2014
                          :
     vs                   :
                          :
ETHICON, INC., et al      :NO. 05384

- - -

Friday, April 7, 2017

- - -

MOTIONS

- - -

COURTROOM 616
CITY HALL
PHILADELPHIA, PENNSYLVANIA

- - -

BEFORE:  HONORABLE ANN M. BUTCHART, J

- - -

GAIL S. FINN, RPR - 215/683-8061

APPEARANCES:

BENJAMIN H. ANDERSON, ESQ.
CHRISTOPHER GOMEZ, ESQ.
JAMES DANIEL THORNBURGH, ESQ.
BOBBY J. BRADFORD, ESQ.
for the Plaintiff

JAMES CAMPBELL, ESQ.
RITA MAIMBOURG, ESQ.
NILS BURTON SNELL, ESQ.
DANIEL R. HIGGINBOTHAM, ESQ.
for the Defendants

- - -

3

I N D E X

Plaintiff's Evidence

Witness:                D.  C.  RD.  RC.



Plaintiff's Exhibit No.:




Defense Evidence

Witness:                D.  C.  RD.  RC.




Defense Exhibit No.:

4

1        (Whereupon this Court is in session)
2              * * *
3        THE COURT:   Two things I hoped to
4   accomplish immediately.  One would be to get
5   the lineup of witnesses and any time
6   constraints that we have with regard to
7   witnesses who might be flying in where there is
8   certainty as to when they have to testify.
9        The second thing I hoped to accomplish was
10  to resolve any objections that the parties have
11  to voir dire so that can proceed a little bit
12  more smoothly.  For the remaining time we will
13  whiz through the motions in limine.
14       In terms of order of witnesses, starting
15  with plaintiff, just tell me who you'll be
16  calling and whether they're live or video and
17  any restrictions we might have.
18       MR. ANDERSON:   Your Honor, Ben Anderson
19  for the plaintiff.
20       We anticipate to have at least three live
21  witnesses and we don't know exactly how many
22  videos we're going to play because, as your
23  Honor may or may not know, we are still in the
24  process with Justice Greenspan of going through
25  the tedious, laborious work of these depo

**25**

1  document retention policy would have started at
2  least -- even if we assume that he is correct
3  on the litigation hold -- their preservation
4  policy would have started at least two years
5  prior to that.  That takes us back to 2005, at
6  the very least.
7       MR. ANDERSON:   Your Honor, may I make one
8  point?
9       THE COURT:   Sure.
10      MR. ANDERSON:   What's interesting about
11  Renee Selman is, in her testimony, which your
12  Honor may hear during the course of this, or
13  not if we're ruled against, she was actually on
14  the letter that was sent out to hundreds of
15  employees saying:  "Do not destroy documents.
16  We have a litigation hold in place.  It listed
17  all the problems in that e-mail.  We don't want
18  to be concerned about a judge when we get into
19  Court and have to explain ourselves," their
20  words, not mine, "explain ourselves because we
21  destroyed documents.  That will look very bad
22  in a courtroom.  Do not destroy documents."
23       She's on the letter going out to hundreds
24  employees.  Ironically, as soon as she leaves
25  they wipe her clean.

**26**

1       At the deposition the question was, "We
2  have 25 e-mails from you for the entire time
3  you were president of the company, correct?"
4       "That's correct."
5       "It should have been on the order of
6  hundreds or thousands, wouldn't you agree?"
7       "Yes, I would agree."
8       "And you sat in on all of the high level
9  board meetings, correct?"
10      "Yes, I did sit in on these high level
11  board meetings."
12      "Yet we have none of the minutes, nothing
13  from your computer about this, do we?"
14      "No, I guess you don't."
15      It's striking to us that the president of
16  the company would send this out to the
17  employees and talk about the very concern that
18  we have right now; that is, a judge like your
19  Honor sitting here who would like to hear these
20  things and, "would not be happy with us if we
21  had destroyed documents and it wouldn't look
22  good for us in a courtroom."  That's the words
23  of the president of the company.  They send
24  that out.
25      What do they do?  As soon as she leaves

**27**

1  they destroy her documents.
2       THE COURT:   What you're looking for is an
3  instruction that this could create an adverse
4  inference, you're looking for that?
5       MR. ANDERSON:   Correct, your Honor.
6       THE COURT:   As I've stated, I'm guided
7  somewhat by the philosophy of my colleagues,
8  although I'm not bound, and from the excellent
9  arguments I heard, and I'm thinking what a
10  great trial this will be, but I also find no
11  reason to go off in a different direction on
12  this particular issue.
13      With regards to Ethicon's motion to
14  exclude evidence of plaintiff's allegation of
15  spoliation, that motion is granted.
16      MR. THORNBURGH:   Thank you, your Honor.
17      THE COURT:   Why don't we stop.  I would
18  love to go into foreign regulatory agencies,
19  but I do need to be over in criminal court.
20      Progress, not perfection, we are getting
21  there.
22      I expect to return here at 2:30 today.
23      If there is any reason for Matt to -- any
24  reason that I have to come over, we will
25  certainly take a break, but I expect at this

**28**

1  point you will be proceeding with jury
2  selection.
3       Is there anything that anybody wants to
4  call to my attention now that I should be
5  thinking about in my spare time?
6       MR. ANDERSON:   Your Honor, Ben Anderson,
7  again.
8       The attorney who was going to argue FDA
9  for us had to return to Texas to take care of
10  his mom.  He can't come back until Monday.  We
11  do have a lot of other business to take care of
12  with your Honor.  I don't think we would get to
13  all of it this afternoon.
14      I would just ask that we be allowed to
15  wait until Monday to argue, because with FDAs,
16  as you may know, there are three or four that
17  tie in on both sides.  We would like to just
18  argue those all as one packet.  If we could
19  wait, we would certainly appreciate the Court's
20  efforts.
21      THE COURT:   That will be fine.  I also
22  will let you know that I will try -- I will
23  make myself available earlier than 9:30, which
24  is when we usually start, so that we can
25  address as many issues as possible.  I can be

| | |
|---|---|
| *IN RE: PELVIC MESH LITIGATION* | **PHILADELPHIA COUNTY** |
| | **COURT OF COMMON PLEAS** |
| Patricia K. Blockus, et al., | **TRIAL DIVISION** |
|       Plaintiffs, | **JULY TERM 2013** |
|     v. | **No. 707** |
| Ethicon, Inc., et al., | |
|       Defendants. | **CONTROL NO.** |

**ORDER**

AND NOW, this 2 ᴺᴬ _____ of _____ 2017, upon

consideration of Defendants' Motion *in Limine* No. 8 to Exclude Evidence of Plaintiffs'

Allegations of Spoliation, and the response by Plaintiffs, if any, it is hereby ORDERED that

Defendants' Motion is GRANTED.

By the Court:

_____ J.

Blockus Etal Vs Ethicon-ORDER

13070070700241

DOCKETED
COMPLEX LIT CENTER

FEB 6   2018

L STEWART

Case ID: 130700707

Control No.: 17101064

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

SHARON CARLINO AND CHARLES  : June Term 2013
CARLINO           : No. 03470
                : Control No. 15122879
    Plaintiffs         :
                :
    v.            :
                :
ETHICON, INC., et al.,      :
                :
    Defendants       :

## ORDER

   AND NOW, this 25th day of January 2016, upon consideration of Defendant's Motion in Limine No. 18 to Exclude Evidence of Plaintiffs' Allegations of Spoliation, it is hereby ORDERED and DECREED that the Motion is GRANTED. Plaintiffs are hereby precluded from introducing evidence at trial related to any allegation that Ethicon has engaged in spoliation of evidence. This Order does not preclude Plaintiffs from requesting other remedies.

             BY THE COURT,

             _____
             KENNETH J. POWELL, JR., J.

Carlino Etal Vs Ethicon-ORDER

13060347000545

DOCKETED
COMPLEX LIT CENTER

JAN 25 2016

J. STEWART

# EXHIBIT 3

**From:** Missouri Courts eFiling System [mailto:mocourts.efiling@courts.mo.gov]
**Sent:** Wednesday, November 19, 2014 2:36 PM
**To:** Missouri Courts eFiling Subscriber
**Cc:** Mathison, Thor Tobin; 26th Judicial Circuit (Camden County)
**Subject:** eNotice - 10CM-CC00085 - DONALD BUDKE V LAKE AREA WOMENS CENTER OF OBGYN, Camden County - Circuit Court

## ELECTRONIC NOTICE OF ENTRY
## (Supreme Court Rule 74.03)
## Camden County - Circuit Court
## CAMDEN COUNTY COURTHOUSE, 1 COURT CIRCLE, STE 8, CAMDENTON, MO


## CASE NO: <u>10CM-CC00085</u> - DONALD BUDKE V LAKE AREA WOMENS CENTER OF OBGYN


MOBAR: 64630
TO: Thor Tobin Mathison


YOU ARE HEREBY NOTIFIED that the court duly entered the following:

| Filing Date | Filing Time | Description | Text * | Last Activity |
|---|---|---|---|---|
| 18-Nov-2014 | 10:40:13 | Order | 21. THE COURT FORMULATED AN OPINION ON THIS AS OF NOVEMBER 19, 2014. WRH | 19-Nov-2014 10:56:49 |
| 18-Nov-2014 | 10:55:55 | Order | 27. PUNITIVE DAMAGES. REQUESTS FOR PUNATIVE DAMAGES IS PREMATURE AT THIS STAGE AND SHALL NOT BE BROUGHT UP BY PLAINTIFF IN OPENING STATEMENT, THE COURT GRANTS DEFENDANTS REQUEST, BUT WILL RECONSIDER RULING AFTER THE PLAINTIFF PRESENTS SUFFICIENT COGENT EVIDENCE TO JUSTIFY CONSIDERATION OF SUCH AN INSTRUCTION. WRH | 19-Nov-2014 11:07:04 |
| 18-Nov- | 11:07:12 | Order | 44. SPOLIATION OF EVIDENCE. | 19-Nov- |

| 2014 | | | THE FIRST QUESTION IS WHETHER SPOLIATION IS A CENTRAL THEME OF THE CASE, WHICH AT THIS TIME, APPEARS NOT TO BE. ALLOWING AN ARGUMENT AS TO SPOLIATION TENDS TO INJECT AN INQUIRY THAT WOULD REQUIRE A TRIAL WITHIN A TRIAL, I.E., A MINI TRIAL, WHICH WOULD USE VALUABLE TIME NEEDED TO TRY THIS CASE IN FULL. DOCUMENT RETENTION, AND RELATED MATTERS CAN BECOME A HIGHLY CONFUSING MATTER FOR THE JURY TO DECIDE, AND AS SUCH CAN BECOME QUITE TECHNICAL. I HAVE NOT SEEN EVIDENCE THAT ETHICON INTENTIONALLY DESTROYED THE DOCUMENTS, BY USING FRAUD, DECEIT OR BAD FAITH. WRH | 2014 11:20:10 |
| 18-Nov-2014 | 10:40:09 | Order | 15. THE COURT SHOULD EXCLUDE ANY EVIDENCE THAT ETHICON NO LONGER SELLS PROLIFT- THE DECISION TO WITHDRAW PROLIFT WAS MADE IN 2012 WHEREAS, THE SURGERY WAS PERFORMED IN 2008, SOME (4) FOUR YEARS PIOR TO WITHDRAWAL. THIS JUDGE, AS SOME PREVIOUS JUDGES BELIEVE THAT THIS SUBJECT, WHICH MIGHT HAVE SOME PROBATIVE VALUE IS OUTWEIGHED BY THE POTENTIAL FOR UNFAIR PREJUDICE TO ETHICON, THE SAME BE PROHIBITED UNLESS THE DEFENDANT CHOOSES TO PUT THE SUBJECT INTO EVIDENCE. WRH | 19-Nov-2014 11:22:01 |

NOTE: **You MUST be a registered user in order to view the documents. If you have not registered for eFiling click here.** If the case or document contains confidential information, you may not be able to view the case or document through the links provided. In the event you are unable to view information electronically, the court will provide a paper copy for your records.

\* If *"None entered at this time"* displays in the text field, the court has not entered any text on this entry. The first 2000 characters of text is provided in this eNotice. To see additional information about the entry made by the court, see Case.net.

Click to access the Missouri eFiling System

This e-mail is auto generated. Please do not respond. **If you have a concern with your filing, please contact the court**. If you need technical assistance, please contact the Office of State Courts Administrator Help Desk by e-mail at osca.help.desk@courts.mo.gov or toll-free by phone at 1(888)541-4894, 7:30 a.m. to 5:00 p.m., Monday through Friday, excluding state holidays.

# EXHIBIT 4

1            REPORTER'S RECORD

2          VOLUME    OF    VOLUMES

3        TRIAL COURT CAUSE NO. DC-12-14350

4   LINDA BATISTE              )    IN THE DISTRICT COURT
                               )
5                              )
    Versus                     )    DALLAS COUNTY, TEXAS
6                              )
    JOHN ROBERT MCNABB, M.D.,  )
7   JOHNSON & JOHNSON, AND     )
    ETHICON, INC.              )    95TH JUDICIAL DISTRICT
8

9

10

11

12        _____

13

14               TRIAL PROCEEDINGS

15        _____

16

17

18

19

20        On the 25th day of March, 2014, the following

21   proceedings came on to be held in the above-titled and

22   numbered cause before the Honorable, Judge Ken Molberg

23   Presiding, held in Dallas, Dallas County, Texas.

24        Proceedings reported by computerized

25   stenotype machine.

```
 1                  THE COURT:  That may be true, that may

 2    very well be true, but I don't -- I'm not persuaded

 3    right now that even evidence of so-called spoliation,

 4    not talking about Medscand, unless I can somehow get it

 5    tied to something specifically at issue in this case.

 6                  MR. FREESE:  Yes, sir, we understand.

 7                  THE COURT:  That's -- I'll let you throw

 8    some dirt, but it has to be relevant dirt.

 9                  MR. FREESE:  We understand that.  Your

10    Honor, we just want a witness to throw some dirt at.

11                  MR. CAPSHAW:  Your Honor, there are a

12    couple of other minor housekeeping things that I know

13    Mr. Cartmell wants to take up, short of reading that

14    one Request for Admission, we'd be done today with the

15    Jury, and the stipulation, we would like to do the

16    stipulation.

17                  THE COURT:  Whatever we do in front of

18    the Jury, let's do it and get them out of here.

19                  MR. FREESE:  The stipulation we can do

20    in the morning.

21                  THE COURT:  That's not lengthy, is it?

22                  MR. FREESE:  It's two pages.

23                  MR. CAPSHAW:  Let me just ask a quick

24    question.

25                  Can we go off the record for just a second,
```

# EXHIBIT 5

20-1177-KHV   Kieffaber v. Ethicon, et al.   02.22.21          1

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
2

3     CAROLYN M. KIEFFABER and
      THOMAS M. KIEFFABER,
4
         Plaintiffs,
5
      v.                              Case No. 20-1177-KHV
6
      ETHICON, INC., and              Kansas City, Kansas
7     JOHNSON & JOHNSON,              Date:   February 22, 2021

8        Defendants.
      .....................
9

10                          TRANSCRIPT OF
                         PRETRIAL CONFERENCE
11            BEFORE THE HONORABLE KATHRYN H. VRATIL
                   UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14    For the Plaintiffs:

15    Mr. David C. DeGreeff
      Mr. Thomas A. Rottinghaus
16    Ms. Vanessa H. Gross
      Wagstaff & Cartmell, LLP
17    4740 Grand Avenue
      Suite 300
18    Kansas City, MO 64112

19    For the Defendants:

20    Ms. Kimberly Bueno            Mr. Philip J. Combs
      Butler Snow, LLP              Thompson, Combs & Spann, PLLC
21    1400 Lavaca Street            300 Summers Street
      Suite 1000                    Suite 1380
22    Austin, TX 78701              Charleston, WV 25301

23    Mr. Bryan E. Mouber
      Baker, Sterchi, Cowden
24       & Rice, LLC
      9393 West 110th Street
25    Suite 500
      Overland Park, KS 66210

1        MR. DeGREEFF:  Your Honor, I don't know if we could do

2   it in ten days.  We've got a spoliation response due on Friday

3   that we're working pretty hard on.  And we're also planning on

4   filing our own spoliation motion at the same time as we file

5   our opposition as long as that's okay with the court.  I know

6   it wasn't included as one of the motions in our pretrial order,

7   but it feels necessary given the stance that the defense has

8   taken.

9        THE COURT:  So what is your theory on spoliation?

10       MR. DeGREEFF:  Your Honor, we believe on spoliation

11   that it was -- there was a motion filed in the MDL seeking

12   spoliation against the defense.  The judge in the MDL actually

13   found that documents were destroyed by the defense and based on

14   West Virginia law he did not sanction them.  But what he did do

15   was say -- was kind of reserve ruling for the courts on remand

16   based on what the spoliation law is in those states, and we

17   believe that it's pretty clearly going to fit within the

18   applicable law here.

19       So the idea is, Your Honor, there was several -- there

20   was laptops of very important witnesses who -- which were

21   destroyed and not preserved.  And so that's the -- that's kind

22   of the long and short of it.  I don't want to argue it here

23   obviously.

24       THE COURT:  Right.  I mean, I -- honestly, if I were

25   going to prioritize your energy, I would rather have you get

1   So I hope that you'll keep that in mind when you see the

2   volume.  It's our hope that we can get a lot of these issues

3   resolved so there's no question in trial.

4            THE COURT:  Well, we're on the same page there.  I

5   think it behooves all of us to front-load the work on this as

6   much as we can.

7            MS. BUENO:  Okay.

8            THE COURT:  So we're willing to do that.  We'll do our

9   best to keep up with you.

10            MS. BUENO:  And I'll also mention - just to respond to

11   what Mr. DeGreeff said on the motion that plaintiffs plan to

12   file regarding spoliation - that is something that is filed as

13   a motion *in limine* by defendants in every case, and so that

14   would be part of what we're filing.  I mean, we can talk with

15   plaintiffs about the best way to get that before the court.

16            But for your background, that's a motion that we

17   always file, to exclude the type of evidence that Mr. DeGreeff

18   mentioned.  And in all of the trials I've been involved with,

19   that motion has always been granted and it's never gone to the

20   jury.  So that is --

21            MR. DeGREEFF:  That's obviously not our experience

22   since we've won it the last few times so --

23            MS. BUENO:  Well, exactly.  That's why I said in the

24   cases that I've been involved with it's never -- it's never

25   gone to the jury.

20-1177-KHV   Kieffaber v. Ethicon, et al.   02.22.21          32

1          MS. BUENO:  Goodbye.  Thank you.

2          (1:55 p.m. proceedings concluded).

3

4                        *  *  *

5

6

7              C E R T I F I C A T E

8     I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10

11

12  February 25, 2021.

13

14

                    /s/ Kelli Stewart _____
15                  KELLI STEWART, CSR, RPR, CRR, RMR
                    United States Court Reporter
16

17

18

19

20

21

22

23

24

25

# EXHIBIT 6

**HONORABLE RACHELLE L. HARZ, J.S.C.**
Superior Court of New Jersey, Law Division
Bergen County Justice Center
10 Main Street, Chambers 359
Hackensack, New Jersey 07601
(201) 527-2685

**FILED**

**NOV 03 2017**

RACHELLE L. HARZ
J.S.C.

This Order is prepared and filed by the Court:

|  |  |
|---|---|
| ELIZABETH HRYMOC and TADEUSZ HRYMOC, | : SUPERIOR COURT OF NEW JERSEY<br>: BERGEN COUNTY-LAW DIVISION<br>: Docket No. BER-L-013696-14 |
| Plaintiffs, | : Master Case No. L-6341-10-CT<br>: |
| vs. | :<br>: CIVIL ACTION<br>: |
| ETHICON, INC.; ETHICON WOMEN'S HEALTH AND UROLOGY, a Division of Ethicon, Inc.; GYNECARE; JOHNSON & & JOHNSON; and JOHN DOES 1-20: | :<br>:<br>: ORDER<br>:<br>: |
| Defendants. | :<br>: |

Before this court is plaintiffs' ELIZABETH HRYMOC and TADEUSZ HRYMOC's (hereinafter "plaintiffs"), motions *in limine* numbered 1-18. and defendants ETHICON, INC., ETHICON WOMEN'S HEALTH AND UROLOGY, a Division of Ethicon, Inc., GYNECARE, and JOHNSON & JOHNSON's (hereinafter "defendants") motions *in limine* numbered 1-22. Oral argument was conducted on October 30 and 31, 2017.

**Plaintiffs' Motions:**

*In Limine I: No defense based on long history of polypropylene use*: **DENIED**. However, defendants' agree to the extent the motion seeks to exclude evidence relevant only to the performance of polypropylene to which no anti-oxidants have been added, this *in limine* motion is **GRANTED**.

1

*In Limine II: No defense based on 510(k) clearance*: **GRANTED**. The FDA §510(k) clearance process is not the equivalent to its premarket approval process. Only the premarket approval process can find a medical device safe and effective. The Prolift and TVT-O were classified as Class II devices, which did not have to undergo the premarket approval process of a Class III medical device. The FDA only conducts scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. As such, he Prolift and TVT-O cannot be presented to the jury as being approved by the FDA as safe and effective.

*In Limine III: Ethicon and its experts, and its other witnesses should be barred from commenting on or discussing the Morgan Liscinsky email*: **GRANTED**. Ethicon agrees that so long as plaintiffs do not introduce evidence or argument regarding Ethicon's marketing of Prolift, prior to FDA clearance, there is no need for it to introduce the Liscinsky email.

*In Limine IV: Not allowed to say no duty to warn by assuming users knew undisclosed risks*: **DENIED**. Under the New Jersey Products Liability Act, a manufacturer has no duty to warn of all risks. "An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used, or in the case of prescription drugs, taking into account the characteristics of, and the ordinary knowledge common to, the prescribing physician." N.J.S.A. §2A:58C-4. The test uses an objective standard.

*In Limine V: No defense based on physicians' professional education*: **DENIED**. This evidence is relevant as to what physicians knew or learned regarding the products in question.

*In Limine VI: Not allowed to claim complications rare*: **WITHDRAWN** by plaintiffs.

2

*In Limine: VII: Plaintiff cannot be found to have comparative negligence based on the record in this case*: **GRANTED**. Defendants do not intend to assert such a defense at trial.

*In Limine VIII: Plaintiff cannot be found to have failed to mitigate or blamed for rejecting tests or treatment based on the record in this case*: **DENIED**. The jury may hear testimony regarding the defense position that plaintiff failed to mitigate her damages. Plaintiff has the opportunity to explain why she chose not to pursue therapy.  This decision should not be construed regarding any determination as to a jury charge pertaining to mitigation of damages.

*In Limine IX: Ethicon cannot raise plaintiff's refusal to permit the defense expert from performing urodynamic testing*: **DENIED**. Plaintiff will have full opportunity to explain to the jury why she refused to undergo this testing from the defense examining expert.

*In Limine X: Plaintiff's treating physicians cannot be blamed*: **GRANTED**. Defense experts cannot render any opinion or inference that plaintiff's treating physicians were negligent in any way or deviated from the accepted standards of care. If there is any confusion in this regard as a result of the testimony of the defense experts, this court will provide the jury with the appropriate instruction.

*In Limine XI: Treating physicians cannot be used as experts*: **GRANTED**. During trial, plaintiffs will object and approach the bench regarding questions they believe are improper to ask of a treating physician on cross-examination. As an alternative, plaintiff's counsel may address the potential issues pertaining to these questions prior to the expert witness's testimony.

*In Limine XII: Ethicon cannot argue that Prolift and TVT-O were unavoidably dangerous devices*: **GRANTED IN PART**. Defendants agree not to argue that Prolift and TVT-O were unavoidably dangerous devices during opening statements.

*In Limine XIII: Defendants cannot introduce evidence of Professional Society Position papers*: **DENIED**.

*In Limine XIV: Ethicon cannot introduce general FDA statements regarding the general attributes of mid-urethral slings*: **GRANTED**. <u>See</u> *In Limine* II above.

*In Limine XV: Ethicon cannot introduce evidence or argument that TVT-O or mid-urethral slings generally are the 'gold standard' or the standard of care for treatment of stress urinary incontinence*: **DENIED**.

*In Limine XVI: No reference to "Time to Rethink" Article*: **GRANTED**. This article is in response to the July 2011 FDA "Update on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." As all FDA testimony is precluded during this trial as a result of this court's decisions, this article will likewise be precluded at trial; it would be impossible to discuss this article without discussing the FDA. However, this court is aware that one of plaintiffs' expert witnesses, Dr. Richard Bercik, endorsed the conclusions set forth in this article. In the event Dr. Bercik should provide any statement at trial inconsistent with the article, defense counsel shall approach the bench to address the situation to potentially utilize this article for impeachment purposes.

*In Limine XVII: Ethicon cannot defend causation or damages by citing Ms. Hrymoc's preexisting condition(s) or seeking apportionment for same*: **GRANTED IN PART**. Defense counsel is not seeking apportionment of damages. Therefore this *in limine* motion is **GRANTED** to the extent it is seeking that there be no apportionment of damages for pre-existing conditions. This court disagrees with plaintiffs' argument that defendants bear the burden of apportioning any pre-existing complaints that are the same or similar to present complaints.

**DENIED IN PART**. Defendants are entitled to present to the jury the facts of plaintiff's medical condition prior to the implantation of the products in question. Plaintiff's medical experts are aware of plaintiff's pre-existing medical conditions and they have taken same into account with regard to their treatments and/or opinions. The lack of express percentage evidence by defendants does not mandate the exclusion of factual information the jury must understand to place in context the opinions of the medical experts in this case. Furthermore, plaintiff's pre-existing conditions are directly relevant to causation. Therefore, this *in limine* motion is **DENIED** to the extent it is seeking exclusion of testimony regarding plaintiff's pre-existing conditions. However, see *In Limine* XIX below.

*In Limine XVIII: Ethicon cannot introduce evidence of risks of alternative procedures that Ms. Hrymoc did not undergo to defend causation or damages*: **DENIED** in that defendants may introduce evidence of risks of alternative procedures that plaintiff did not undergo. However, no expert may opine as to whether the plaintiff would actually have sustained any particular injury if she had undergone any of these alternative procedures.

*In Limine XIX: Unrelated medical conditions should not be referenced (8 examples)*: **GRANTED** as to 1985 laparoscopy; February 18, 2000 pelvic ultrasound; heart palpitations and blood pressure; arthritis in her wrists; discomfort in her breasts; and a panic attack that she had 20 to 25 years ago.

**DENIED** as to prior back, abdominal and pelvic pain. Evidence regarding these pre-existing injuries can serve various roles in defendants' case pertaining to proximate cause and damages. While plaintiffs argue that these medical conditions are not related to plaintiffs' claims, the province of weighing this testimony and determining the relationship, if any, of pre-and post-medical conditions of the plaintiff, belongs to the jury.

*In Limine XX: Mesh explant pathology reports should not be utilized at trial*: **GRANTED**. As set forth on the record, Dr. Theodore Matulewicz's report cannot be utilized at trial by any expert witness unless Mr. Matulewicz is available for cross-examination by the adverse party. A pathology diagnosis is complex and the pathology opinions regarding the slides in question are central to various issues in this case. James v. Ruiz, 440 N.J. Super. 45, 3 (App. Div. 2015); Nowacki v. Community Medical Center, 279 N.J. Super. 276, 280 (App. Div. 1995).

*In Limine XXI: Defendants should not tell jury about all potential symptoms of Prolapse*: **RESERVED**. This court will make the appropriate rulings during trial should this issue arise.

*In Limine XXII: No motions to irrelevant, misleading or prejudicial evidence (4 examples)*: **GRANTED** as to: a) there should be no reference to tort reform, a litigation crisis, or otherwise critical comments about lawsuits in general; b) there should be no argument or discussion by counsel, a defense witness, or expert regarding family members, friends or other patients; c) there should be no reference to increases in the costs of healthcare, or health products, by reason of medical lawsuits or claims; and

d) collateral source rule: **RESERVED** in that the parties have agreed to meet and confer.

*Plaintiffs' Motion to Limit the Scope of Admissibility of Defendants' cross-designations and affirmative designations*: See the court's ruling on Defendants' motion *in limine* number 18.

## Defendants' Motions

*In Limine 1: Motion to prohibit the use of deposition videos or testimony, or any video, in the opening*: **GRANTED**. However, parties are permitted to quote and summarize deposition testimony in their opening statements.

*In Limine 2: Motion to exclude in-court demonstrations or testing of exemplar devices*: **GRANTED**. Plaintiffs represent they do not intend to perform such a demonstration. However,

plaintiffs reserve their right in the event the defense opens the door to the issue. This court has determined that the jury shall not touch or manipulate any exemplar mesh device. Furthermore, no exemplar mesh device shall be sent back to the jury room at any time.

*In Limine 3: Motion to exclude any evidence or argument that Defendants violated J&J credo or any internal corporate rules or "safety rules" that suggest a standard higher than the standard of care contained in the jury instructions*: **GRANTED IN PART** as to the J&J credo. Plaintiffs have represented that they have no intention of introducing this credo but reserve the right to do so in the event defendants open the door. **DENIED IN PART** as to the safety rules and internal corporate rules. Defendants own internal standards are admissible. The standards were testified to by defendants' medical affairs and regulatory affairs directors. Defendants' safety standards are relevant with regard to plaintiffs' claims pertaining to design defect and failure to warn. There has been no showing to this court as to any safety standard utilized by defendants that imposes a higher standard than that required by the law that will be charged by this court.

*In Limine 4: Motion to prohibit reference to "confidentiality" stamps on produced documents or reference to any documents not publicly disseminated as "secret" internal documents*: **RESERVED**. If this issue arises during trial the court will address same at that time.

*In Limine 5: Motion to preclude argument that Defendants had a duty to warn Plaintiff directly or that Plaintiff would have refused surgery if she had been given different information*: **GRANTED** as to a duty to warn plaintiff directly. Plaintiff has agreed that they will not present such an argument in their opening statement. If this issue should be further developed during the course of the trial, same shall be addressed by the court at that time. **DENIED** as to whether plaintiff would have refused surgery if she had been given different information. Plaintiffs may argue that plaintiff would have refused surgery if she had been given different information. This court disagrees with

7

the defendants' position pertaining to proximate cause. This court finds that the inquiry does not end with whether or not the implanting physician would have prescribed the product in question had the doctor been given further or different warnings. The Appellate Division affirmed the Hon. Carol Higbee's decision in <u>Gross v. Gynecare</u>, 2016 WL 1192556 (NJ Super. App. Div. March 29, 2016), wherein she charged the jury that they could consider what decision the mesh patient, Linda Gross, would have made on her treatment if she was adequately warned by the implanting surgeon. Furthermore, this principle was recently reiterated by the Appellate Division in the Accutane MCL. <u>Rossitto v. Hoffman-LaRoche</u>, 2016 WL3943335 (App. Div. July 22, 2016).

*In Limine 6: Motion to exclude arguments that the IFUs or brochures were required to include frequency, incidence, or severity rates or adverse events*: **WITHDRAWN**.

*In Limine: 7: Motion to preclude argument that Defendants had a duty to train* physicians: **GRANTED**. However, plaintiffs are not precluded from presenting evidence regarding what affirmative actions were taken by defendants to train the implanting physicians and what training was given to physicians by defendants.

*In Limine 8: Motion to exclude Medical Device Reports ("MDRs") i.e., reports of adverse events furnished by physicians, summaries of these reports, and/or aggregate numbers of MDRs for Prolift, TVT-O, or any other product*: **DENIED**. This court finds that MDRs and other information regarding risks, complications, and bad outcomes with the products at issue is relevant evidence in this trial. These reports may demonstrate defendants' knowledge as to the nature of complications sustained by patients which may impact on the design and warning claims presented by plaintiffs. This court finds that MDRs, reports of adverse events furnished by physicians and summaries of these reports are admissible as a business record. N.J.R.E. 803(c)(6). Further, MDRs may be relevant as a partial basis to support causation.

8

*In Limine 9: Motion to exclude evidence of other vaginal mesh lawsuits or claims*: **RESERVED**. Plaintiffs have agreed not to submit information regarding other vaginal mesh lawsuits. Plaintiffs reserve the right to submit such information in the event the door is opened by defendants. Utilization of the term "gold standard" does not open the door. The parties also have determined that this motion is moot as an *in limine* motion and is an issue that must be dealt with during trial.

*In Limine 10: Motion to exclude evidence of past issues and related documents no longer relevant and other documents generated for foreign regulatory requirements*:

a. **GRANTED**: 2003 Daoud Report

b. **GRANTED**: 1997 Medscand Agreement

c. **GRANTED**: Documents generated by foreign regulatory bodies

*In Limine 11: Motion to exclude any argument, testimony or other evidence of post-implant changes to Ethicon's IFUs or brochures and all evidence of associated communications with Health Canada*: **DENIED**. The changes to the IFU required by Health Canada were not remedial actions under N.J.R.E. 407. See <u>Gross</u>, supra, 2016 WL 1192556, at *22 (App. Div. Mar. 29, 2016).

*In Limine 12: Motion to exclude irrelevant off-color and unduly prejudicial emails*: **DENIED** as to Exhibits 84 and 89. **GRANTED IN PART** as to Exhibit 88: redact "s—t"; Exhibit 83: redact "I've never tried the wire brush thing so I won't comment"; **GRANTED** as to Exhibit 90.

*In Limine 13: Motion to bar Plaintiffs from offering any evidence concerning any Material Safety Data Sheets, including any suggestion that polypropylene causes or may cause cancer*: **ORAL ARGUMENT PENDING.**

*In Limine 14: Motion to exclude the DVD concerning Kugel Composix hernia mesh*: **ORAL ARGUMENT PENDING.**

*In Limine 15: Motion to split and limit the amount of time allowed for the parties to present their cases to the jury*: **GRANTED**. The time frames were decided while on the record during oral argument.

*In Limine 16: Motion to preclude the videotaped testimony of Plaintiffs' expert Dr. Daniel Elliott and expert Dr. Bruce Rosenzweig at trial*: **WITHDRAWN**.

*In Limine 17: Motion to exclude testimony or evidence regarding plaintiffs' allegations of spoliation*: This *in limine* motion seeks an order denying the ability of plaintiffs to present to the jury evidence of defendants' loss and destruction of documents and evidence. Defendants argue, among other things, that the lost evidence is neither relevant nor probative to any of the causes of action that plaintiffs are required to prove, and if relevant, the evidence is more prejudicial than probative.

Defendants rely in part upon the rationale and reasoning of federal MDL Magistrate Judge Cheryl Eifert's opinion that rejected plaintiff's motion, pertaining to all the MDL cases, seeking spoliation sanctions, including default judgment in some cases, the striking of defenses in other cases, an adverse instruction in all cases, and attorneys fees and costs. In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig., 299 F.R.D. 502 (S.D.W. Va. 2014). The motion before Judge Eifert concerned destruction of the same documents at issue before this court.

It must be noted that the law in the Fourth Circuit allowing sanctions for spoliation require that the party that was responsible for the destruction or loss have a culpable state of mind.

Judge Eifert found that Ethicon did not willfully or intentionally destroy evidence specifically for the purpose of preventing its disclosure in pelvic mesh litigation. Of note, under New Jersey law, the state of mind of the spoliatior is not a factor in the legal determination of spoliation. Ethicon's level of intent, whether negligent or intentional does not affect the spoliators

10

liability, rather, it is a factor to be considered when determining the appropriate remedy or sanction for the spoliation. Aetna Life and Casualty Co. v. Imet Mason Contractors, 309 N.J. Super. 358 (App. Div. 1998).

According to Ethicon's papers, the spoliation at issue occurred when an employee left Ethicon and generally one of two things happened. One, the employee forgot to tell their manager that the laptop that they were handing in contained documents that were the subject of a litigation hold notice, and the computers were given to the IT department to be wiped clean for repurposing. Or two, the departing employee informed their manager that they had documents on their laptop that were subject to a litigation hold and then the manager did not properly communicate that information to the IT department before the IT department wiped the devices clean and put it back on inventory.

There is no question that Ethicon had a duty to preserve evidence for use in this litigation. In dispute is the date of this duty to preserve. Plaintiffs argue it is May 22, 2003 and defendants argue it is April 30, 2007. The dispute regarding the date is not relevant to this court's decision with regard to the instant *in limine* motion.

There is also no question that Ethicon breached its duty to preserve evidence with regard to some employees' custodial files. The existence of a duty to preserve evidence is a question of law to be determined by the court. Cockerline v. Menendez, 411 N.J. Super. 596 (App. Div. 2010). Regardless as to the number of employees custodial files involved, and regardless if the litigation hold effective date was 2003 or 2007, Ethicon's failure to monitor its litigation hold was negligent. This court notes that Judge Eifert concluded that Ethicon's failure to better implement and monitor its litigation holds were negligent, and perhaps grossly negligent in some cases.

This court can fairly presume that some of the missing evidence would be relevant because the custodial files that were destroyed belonged to employees involved with the products at issue. Plaintiffs have carried their burden of demonstrating that the lost materials contained relevant evidence and therefore plaintiffs have established the criteria necessary to establish spoliation of evidence. Once plaintiffs show that the spoliation material is relevant, the burden to show otherwise falls on defendants charged with the spoliation.

This court must consider the prejudice that flows from the loss of the evidence. A measure of the appropriateness of a sanction for the spoliation is to restore the prejudiced party to the same position they would have been in the absence of the wrongful destruction of evidence by the opposing party. Manorcare Health Services, Inc. v. Osmose Wood Preserving Inc., 336 N.J. Super. 218 (App. Div. 2001).

Judge Eifert determined that to support an award of the extreme sanctions that were sought by the plaintiffs, they had to demonstrate to her with some degree of precision that unique and relevant evidence was lost and that the loss created an evidentiary hurdle to them in presenting the essentials of their cases.

In contrast, before this court, no extreme sanctions are being demanded. This motion *in limine* brought by defendants is not the same motion that was brought before Judge Eifert by plaintiffs. This court acknowledges that to have any jury hear testimony of spoliation is logically prejudicial to the spoliator. It is not, however, by legal definition a sanction. Defendants argue that by allowing this jury to hear the spoliation evidence this court is imposing a sanction on defendants. This court disagrees with that conclusion. A sanction would be an adverse inference, striking a pleading, or disallowing the testimony of a witness at trial, etc.

12

Defendants also argue that unless the jury is provided with a specific instruction at the end of the trial regarding spoliation, the jury will not know what to do with the evidence presented. This evidence of what occurred with regard to the spoliation is no different than any other factual evidence the jury is entitled to hear at trial. For example, this court will not be giving the jury any special instruction regarding testimony defendants will elicit concerning plaintiff's pre-existing medical conditions. The jury will not be provided with any pre-existing diagnosis of the medical conditions or any testimony allocating increased worsening, if any, of her medical conditions. Her pre-existing medical complaints are factual information that the jury is entitled to hear or know about and utilize as they see fit.

Ethicon has explained to this court in its written submissions and at oral argument, the voluminous documents and communications that have been provided to plaintiffs. Ethicon has explained how documents are stored and transferred and have argued that the missing documents actually exist and have been produced to plaintiffs through other means. For example, Ethicon explained that its employees work in teams and the email exchanges were sent between multiple senders and recipients. Ethicon argued the missing emails and documents could be retrieved from the files of other participants in the exchange. Ethicon also argued that some of the custodians who left Ethicon gave their material documents to employees remaining at Ethicon. These explanations and this information can be provided to the jury as it was provided to this court.

Judge Eifert acknowledged the possibility that certain relevant email communications were permanently lost. Plaintiffs did not, however, provide to Judge Eiffert any concrete evidence of prejudice to their cases as a whole, particularly not to the extent of prejudice that would justify across-the-board sanctions such as default judgments, striking of defenses and the offering of an adverse instruction in every case. As stated previously, the motion before Judge Eifert was a very

different motion than the one before this court. Not only is the state law different, but also the posture of the motion and the requested relief is different.

Judge Eifert, in her decision, did not preclude a jury from hearing the testimony regarding the custodial files that were destroyed. Plaintiffs were seeking to have Judge Eifert enter default judgment against Ethicon in three bellwether cases and to strike Ethicon's statute of limitations and learned intermediary defenses in all cases. Those are severe sanctions. Judge Eifert found the plaintiffs had not established that Ethicon acted willfully or in bad faith regarding the loss of evidence nor had plaintiffs' demonstrated prejudice so substantial that their cases were irreparably damaged. Therefore, Judge Eiffert concluded that extreme sanctions, such as, default judgment and striking of defenses were not justified and denied plaintiffs request for those forms of relief. Likewise, she denied plaintiffs request to order an adverse inference instruction in all cases. Of note, Judge Eifert found the plaintiffs succeeded on their motion for a finding of spoliation.

This court must formulate the appropriate manner in which this evidence can be introduced at trial. Defendants argue that it is basically impossible for them to have a fair trial once a jury hears any testimony regarding the destruction of documents under the watch of a corporate defendant. Defendants presented to this court, in its papers and at oral argument, evidence that demonstrates that the totality of documents provided in discovery by defendants compared to that which is arguably destroyed or lost is minimal.

By virtue of this evidence, this court is aware, as can be the jury, that lost documents were recaptured through other mechanisms. Furthermore, Ethicon maintains that all of the documents necessary for plaintiffs to present their cases have been produced because all crucial documents were centrally maintained at Ethicon, including materials related to product design, regulatory affairs, marketing, adverse events and complaints, and post-market surveillance. Plaintiffs do not

argue that they cannot prove their case because of missing documents. Plaintiffs argue that there is significant question of what more would have been found in the missing documents and how those materials would impact its proofs. It is a question that can never be answered.

This court does not have the authority to determine that which was destroyed would, as a matter of law, have no impact or bearing on plaintiffs' claims. The presumption that there are potential documents further supporting plaintiffs' claims is a rebuttable presumption. As this court was educated regarding Ethicon's document retention and document discovery so can a jury be so educated. By New Jersey law, the decision as to how much weight to give the evidence regarding the lost documents and explanation for same, rests with the jury of this case, not this court.

What this court cannot do, as a matter law, is decide that the plaintiffs, more probably than not, are in receipt of the vast majority of documents that were lost. Nor can this court decide, as a matter of law, that anything that the plaintiffs did not receive due to spoliation, in and of itself, is not important to plaintiffs' causes of action. This court recognizes that plaintiffs are in possession of a significant amount of discovery provided by defendants through which they are proving their claims. But that does not give this court the authority to decide that the spoliation is of no consequence to plaintiffs' proofs. Such a ruling would in effect be the same as a determination that no spoliation occurred at all.

It is undisputed that the plaintiffs cannot show what is in the lost documents. As the spoliator, the defendant has the burden of proving the lack of relevancy of the lost materials. Clearly it is impossible for defendants to do that. If this court was to exclude spoliation testimony, it would in essence be giving the benefit of the doubt to the defense.

This court has the authority to control the manner in which evidence can be presented to the jury; this court has determined that the issue of spoliated evidence cannot be a predominate

and overwhelming theme during this trial. Accordingly, there shall be no mention of spoliation in the opening. The approximately two hour deposition testimony of Mr. James Mittenthal shall be the only testimony provided to the jury regarding the issue. Any question that will be presented by any party to any other witness regarding spoliation must first be permitted by this court and must be presented to the court before the witness takes the witness stand. The issue of spoliation may be addressed during closing for no more than five minutes. The foregoing limitations have been set to ensure proportionality of the subject of spoliation in the context of the overall presentation of the case and in direct response of defendants' concern that the theme of spoliation can become central to the trial.

Based on the foregoing, defendants' motion *in limine* to exclude testimony or evidence regarding plaintiffs' allegations of spoliation is hereby **DENIED**.

*In Limine 18: Motion to admit video deposition testimony consistent with the doctrine of completeness and R. 4:16(c) definition of witness unavailability:* This court received supplemental briefing on this issue after oral argument from defense counsel on November 2, 2017 and a response thereto from plaintiffs' counsel on November 3, 2017.

There are two distinct issues raised in this *in limine* motion and through oral argument. The first issue concerns the playing of video depositions of former employees of defendants that presently reside outside the state of New Jersey and whether or not they are therefore deemed unavailable. This court finds that former employees of defendants that presently reside outside the State of New Jersey are unavailable witnesses pursuant to R. 4:16-1(c). The video deposition testimony of former employees presently living outside the jurisdiction and subpoena power of the State of New Jersey may be utilized at trial. "The unavailability of a witness under R. 4:16-1(c) is essentially the same as under N.J.R.E. 804(a)(4)." Avis Rent-A-Car, Inc. v. Cooper, 273 N.J.

Super. 198, 200 (1994). Pursuant to these foregoing Rules, and the body of New Jersey case law interpreting these Rules, the parties may utilize the videotaped deposition testimony of former employees outside the State of New Jersey and are not required to also meet the reasonable diligence standard to procure these witnesses' attendance by subpoena.

However, with regard to defendants' present employees regardless of where they live, and former employees presently residing in the State of New Jersey, plaintiffs are not required to utilize the witness's deposition testimony. The witness must be present in court unless defendants can prove that "all reasonable means to procure the declarant's attendance at trial [have] be[en] exhausted." Avis, 273 N.J. Super. at 200. This analysis is not altered for corporate designees, as plaintiffs' suggest.

Therefore, contrary to the position of defendants, it is the right of plaintiffs to utilize subpoena powers for present employees regardless of where they live (notice in lieu of subpoena), and former employees that live in New Jersey, to require they be present for live testimony during this trial. Of course, subpoenas to require the appearance of these witnesses must be appropriately issued and served.

The following pertains only to present and former employees that reside in New Jersey and can be appropriately issued and served via subpoenas: it has been represented to this court that since witnesses were deposed (many years ago) additional discovery has revealed new information by way of production of documents, additional depositions, label changes and information learned at subsequent depositions. Plaintiffs' wish to utilize this new information on cross-examination at trial. This court agrees that pursuant to New Jersey law, plaintiffs may utilize subpoena power to have defendants' present employees regardless of where they live, and former employees presently residing in the State of New Jersey, appear live at trial and plaintiffs are not compelled or limited

17

to the use of the prior videotaped deposition testimony. Defendants are on notice that trial testimony of these witnesses may encompass the additional discovery that plaintiffs' maintain has been revealed by way of production of documents, additional depositions, label changes and information learned at subsequent depositions.

Based on the foregoing, this *in limine* motion is **DENIED IN PART AND GRANTED IN PART.**

The second part of this *in limine* motion seeks an order of this court to allow defendants' counter-designations of a witness to be played during plaintiffs' case-in-chief. This portion of the *in limine* motion is **DENIED IN PART**. The Doctrine of Testimonial Completeness pursuant to R. 4:16-1(d), and New Jersey case law interpreting this rule, do not provide for the entirety of defendants' designations to be played during plaintiffs' case-in-chief. However, testimonial completeness provides that this court shall consider cross-designations or other portions of a deposition "which ought in fairness to be considered with the part introduced." R. 4:16-1(d). This court will make any determination as to completeness. Based on the foregoing, this *in limine* motion is **DENIED** except as to counter-designations pertaining to testimonial completeness.

Hon. Rachelle L. Harz, J.S.C.

Nov 3, 2017

18

# EXHIBIT 7

| | |
|---|---|
| *IN RE: PELVIC MESH LITIGATION* | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION – CIVIL** |
| **THIS DOCUMENT RELATES TO:**<br><br>Kimberly L. Adkins,<br><br>       Plaintiff,<br><br>   v.<br><br>Ethicon, Inc., et al.,<br><br>       Defendants. | **JULY TERM 2013**<br>**No. 00919** |

## DECLARATION OF JAMES P. MITTENTHAL

I, James P. Mittenthal, hereby declare as follows:

## I.  BACKGROUND

1.  My name is James Peter Mittenthal. I am over twenty-one years of age and of sound mind. I am competent to affirm to all of the matters set out in this Declaration.

2.  I have over 30 years of experience supporting legal services. From 1985 through 1992, at Legal Support Services Corporation, I developed a suite of law office software and other technology to manage large-scale document productions in product liability and other mass litigation. In 1992, I joined Price Waterhouse, where I spent four years advising law firms and law departments regarding information technology and information management issues, including issues regarding record retention and the discovery life cycle. In 1995, I opened the New York office of Baker Robbins & Company, a national technology consulting firm. Through 16 years at the firm (including its acquisition by Thomson Reuters and merger with Hildebrandt International), I assisted law firms and law departments with technology acquisition, information management, and litigation support, and eventually headed its litigation support group, before

our group transitioned the practice to Epiq in 2011. I hold a bachelor's degree in English (Honors Program) from the University of Michigan and a law degree from Boston University.

3.      Over the last 30 years supporting the legal services industry, I have had extensive experience advising corporations, governmental entities, and other organizations regarding user-created information, enterprise and departmental information, archival information, and the supporting infrastructure; retention and disposition of business information and records, both in the ordinary course of business and in connection with litigation, including the implementation of appropriate legal holds; and the assessment, collection, and production of hard copy and electronically stored information in litigation.

## II.      OVERVIEW OF WORK ON BEHALF OF ETHICON

4.      Beginning in or about August 2011, I was asked by Ethicon, Inc. ("Ethicon") to examine the company's efforts with respect to records management and retention and its underlying technology environment, among other topics, to prepare for and provide testimony as a corporate representative in connection with the pelvic mesh litigation in the federal multidistrict litigation ("MDL") and New Jersey consolidated proceeding.

5.      In connection with my review, I interviewed over 100 different individuals, sometimes on multiple occasions, in connection with network infrastructure, business systems, and records management and retention, including both Ethicon and Johnson & Johnson personnel within Information Technology, Quality Systems, Supply Chain, Regulatory, Research and Development, Marketing, and Sales groups, as well as certain third parties with information and facilities management or collection responsibilities. At least 50 of my interviews were mainly concerned with records management and retention.

6.      In addition, I conducted numerous onsite visits to Ethicon's headquarters in Somerville, New Jersey, as well as to the corporate data center and offices in Raritan, New Jersey and the Health Care Systems facilities in Piscataway, New Jersey.

7.      In approximately April 2013, I was asked to examine certain record retention issues related to specific custodians who had been found to have few or no documents in their "custodial files." In this context, I spoke to current employees and former employees, including managers and administrative assistants, as well as records management, information technology and human resources personnel. In connection with this aspect of my work, I also requested, received, and reviewed portions of deposition testimony of certain former employees and documents regarding compliance with records retention procedures, such as completed exit checklists.

8.      As part of my work, I have provided deposition testimony as a corporate representative on behalf of Ethicon on six different occasions: December 7, 2011; December 4, 2012; May 14, 2013; August 13, 2013; September 25, 2013; and February 10, 2014. Plaintiffs devoted the last four days of depositions primarily to records retention and the issue before this Court.

9.      In addition, in January 2014, I submitted a declaration in connection with the federal MDL proceeding in support of Defendants' Opposition to Plaintiffs' Motion for a Finding of Spoliation and for Sanctions.  I am submitting this Declaration in order to update the January 10, 2014 declaration and to take into account continued document productions and other recent developments.

III.    **SUMMARY OF FINDINGS**

　　　10.　　The following is a summary of my key findings, which are set out more fully

below:

- Ethicon has produced millions of pages of documents in this litigation, addressing design and development, regulatory issues, marketing, complaints and clinical data, that were collected from central sources as well as hundreds of individual custodians working in these functional areas.

- At all time periods relevant to this litigation, Ethicon has had in place written record retention policies, procedures, training, and technology that were reasonably designed to effectuate record retention consistent with its obligations both in the ordinary course of business and in connection with pelvic mesh litigation.

- Beginning in approximately April 2013, Ethicon identified that certain former employees' "custodial files" contained few or no documents. I determined that, in many cases, the employee understood and properly preserved documents while working at Ethicon, but upon the employee's departure or separation from the company, his or her electronic data were not properly transferred to the company due to miscommunication or misunderstanding.

- Both in the normal course and in direct response to the identification of these issues, Ethicon has taken – and continues to take – steps to address them (as well as its record retention and legal hold practices in general) and implement processes to minimize the risk of similar losses of data in the future.

- The impact of the loss of any individual-level data is minimized in light of the following:

    o    the modern corporate environment, in which technology infrastructure directs users to create and manage documents and information in centrally stored and managed locations, such as Microsoft SharePoint sites, group or department shares, databases, and other electronic systems, rather than on a drive to which only a single user has access; and

    o    the redundancies incorporated into Ethicon's document collection practices (collection from databases and other central sources and collection from numerous custodians within a single functional area).

- At no time during my examination and assessment did I identify any instance in which Ethicon intentionally or selectively destroyed materials known to be relevant to the pelvic mesh litigation.

**IV.    ETHICON'S DOCUMENT COLLECTION AND PRODUCTION TO DATE
        HAVE BEEN FAR-REACHING AND SUBSTANTIAL**

11.    I understand that, as of May 15, 2017, Ethicon has produced more than 3.1 million documents, comprising more than 25 million pages, in connection with Ethicon's involvement in pelvic mesh litigation ("the Global Production"), in addition to millions of additional pages of documents in native form.  Ethicon has produced the Global Production in the MDL, New Jersey consolidated proceeding, and individual state cases.

12.    Ethicon collected these documents from a wide range of electronic and paper sources both in and outside the United States, including both custodial (individual) and non-custodial (general or central) sources.

13.    Ethicon's custodial collections took into account more than 300 current or former internal employees who held responsibilities in a wide variety of areas pertaining to Ethicon's pelvic mesh products, including research and development; design and engineering; preclinical testing; clinical development; regulatory; manufacturing; quality and compliance; labeling; marketing; sales; professional education; medical affairs; and post-market surveillance.

14.    Typically, Ethicon performed custodial collections for multiple individuals in a department or area. For example, in some areas, such as marketing, more than 40 individuals were the subject of custodial collections. Likewise, Ethicon collected from more than 20 individuals employed in a clinical or medical affairs capacity and more than 20 individuals who had regulatory responsibilities.

15.    In addition, significant volumes of electronic and hard copy documents have been collected from non-custodial sources such as group and departmental file shares, databases, websites, other enterprise electronic systems, and warehouse storage facilities.

16.     These materials collected from general or central sources encompass the same broad range of subject matters or functional areas identified in paragraph 13 above, including design, regulatory, labeling, copy review (which includes marketing, professional education and training), clinical and preclinical studies, and complaints.

17.     Most "files of record" (many of which are required to be maintained and preserved by Ethicon under federal and other regulations) are maintained in general or central sources, rather than in any one individual's custody.

      a.     For example, the Design History File ("DHF") is a collection of materials that Ethicon maintains centrally. The DHF memorializes the design and development of a given product. It comprises a vast array of materials, including design drawings, testing reports, meeting minutes, memoranda, and emails. A DHF for a single product may number tens of thousands of pages. Ethicon has produced the DHF for each of Ethicon's pelvic mesh products at issue in pelvic mesh litigation.

      b.     Likewise, Ethicon's applications for 510(k) regulatory clearance for its products are maintained centrally. Ethicon has collected and produced the 510(k) application files for each Ethicon product at issue in pelvic mesh litigation, and those files include the applications and supporting materials as well as correspondence to and from FDA.

      c.     Ethicon has collected and produced Instructions for Use ("IFUs"), which were included in the packaging of the product, for each of Ethicon's pelvic mesh products at issue in pelvic mesh litigation. The IFUs and other

labeling materials were collected from the AGILE and Adaptiv databases, document control applications.

d.       Ethicon's copy review of marketing and certain training and professional education materials is conducted on a centrally-maintained electronic database, Blue, (and the successor system, EOS). Relevant materials from Blue and EOS have been collected and produced in this litigation.

e.       Federal regulations require Ethicon to maintain files regarding all reports of complaints or adverse events associated with the products it manufactures. Ethicon maintains its complaint files on enterprise systems, and produced in this litigation complaint files regarding the pelvic mesh products at issue, regardless of the country from which the complaint originated.

f.       Ethicon manages information pertaining to clinical research regarding the pelvic mesh products in various Microsoft SharePoint sites, network shares, and the Oracle Clinical database. Each of these central sources has been subject to collection and production.

## V.    ETHICON HAS ESTABLISHED SOUND GENERAL RECORD RETENTION POLICIES AND PROCEDURES AND HAS ISSUED TIMELY AND APPROPRIATE HOLD NOTICES IN PELVIC MESH LITIGATION

18.     My fact-finding shows that, at all times relevant to this litigation, Ethicon has had in place written record retention policies, procedures, training, and technologies that were reasonable for a company of its type and size and were designed to facilitate appropriate record

retention, both in the ordinary course of its business operations and regulatory framework generally and in connection with pelvic mesh litigation specifically.

**Ethicon's Ordinary Course Record Retention**

19.     By way of background, Ethicon employs more than 11,000 people worldwide and has offices, Research & Development centers, and manufacturing facilities in more than 50 countries.

20.     As a medical device manufacturer, Ethicon operates in the ordinary course of its business in a highly regulated environment, including with respect to record retention.

21.     To comply with its regulatory requirements with respect to record retention, Ethicon has established robust policies, schedules, and procedures governing retention that apply even in the absence of litigation.

22.     These policies, schedules, and procedures, which I understand are described more fully in the declaration of Lisa Kaiser, Ethicon's Director of Worldwide Quality Systems, take into account Ethicon's business and operational requirements as well as tax, regulatory, and corporate policy mandates. Ethicon uses a variety of means to drive policy creation, development, and conformity with corporate standards, such as annual audit reviews and the Corrective and Preventative Action ("CAPA") mechanism.

23.     The schedules and procedures provide clear guidance as to how numerous different categories of records and information stored in various formats or "containers" (e.g., paper, electronic) are to be retained. Under Ethicon's ordinary course records retention, many types of records related to its products (including but not limited to pelvic mesh products) are retained for at least the "life of production" (product) or "life of the organization" (Ethicon),

including DHFs, laboratory notebooks, technical reports, labeling content, and FDA submissions.

24.      This is not to say, however, that Ethicon or any other company should (or is required to) retain every document for all time.

25.      The American Records Management Association ("ARMA") and the International Standards Organization ("ISO") both provide that, absent a legal, regulatory, historical, or other reason defined in an organization's retention schedule, information should be dispositioned when it no longer has a valid business function or purpose.

26.      Ethicon's records retention policies, schedules, and other procedures encompass the above principles, providing overarching reminders that documents should not be retained past their defined retention period unless subject to a hold notice.

27.      Ethicon has had in place training programs and protocols to educate its employees as to record retention. New employees at Ethicon receive Records and Information Management ("RIM") training. An example of a training program from 2011 is attached as Exhibit A.

28.      This training provides an overview of the records and information management program, including its benefits and the risks of non-compliance. It provides detailed information regarding other issues such as (i) the lifecycle of records and information; (ii) the distinction between a record and convenience information; (iii) roles and responsibilities with respect to records and information management; (iv) managing electronic records in particular; and (v) legal holds (the last of which will be discussed further in paragraphs 40 to 43 below).

29.      Ethicon's training is interactive, requiring employees to "check their understanding" of these issues as they move through the program. Employees are required to re-

certify themselves on this training on an annual basis and receive reminder emails if they have not completed the training.

30.     In addition to the above "ordinary course of business" practices, Ethicon took specific steps to promote appropriate record retention in connection with the commencement of litigation regarding its pelvic mesh products.

<div align="center"><strong>Ethicon's Issuance of Legal Holds</strong></div>

31.     In connection with my investigation, I learned that prior to 2008, there were approximately five cases against Ethicon related to TVT, none of which were part of a consolidated or other mass tort proceeding. In 2008, approximately five cases were filed against Ethicon in New Jersey state court beginning with the case *Lombardi v. Gynecare*, Docket No. 000772-11.

32.     Between 2008 and late 2010, the number of pelvic mesh cases filed against Ethicon in New Jersey and other courts around the country increased, as did discovery demands. In October 2010, approximately 60 cases were consolidated in New Jersey.

33.     Between late 2010 and 2012, the number of cases filed against Ethicon grew to several hundred cases in New Jersey and approximately 50 cases outside of New Jersey.  On February 6, 2012, the federal multidistrict ligation was created in the Southern District of West Virginia before Judge Goodwin.

34.     As the number of cases grew, Ethicon combined the various legal holds it had issued into one consolidated legal hold, which Ethicon issued on February 18, 2011.  The 2011 consolidated legal hold identified prior legal holds for products that were considered potentially relevant to the pending product-liability litigation.  For TVT, the consolidated legal hold

referenced Ethicon's April 30, 2007 hold notice issued in the action *Wallingford v. Johnson & Johnson, et al.* Docket No. RG07312197.

35.     Prior to 2007, there were only three hold notices involving TVT, two of which were released.  None of the prior TVT hold notices pertained to cases involved in the New Jersey consolidated proceeding or other mass tort litigation.

    a.     *Keli Francesca Sponner vs. Dr. Jillian Woinarski*, was brought in the County Court of Victoria at Melbourne, Australia on February 1, 2001, against the treating physician.  While the case involved TVT, neither Ethicon nor Johnson & Johnson was a party to the suit which was a medical malpractice action.   A hold notice was issued on May 16, 2001.  Ethicon's records reflect that the matter was resolved between the doctor and the patient in or about April of 2002.

    b.     *Kandell v. Ethicon, Inc.*, Case No. 16-03-07400, filed in Oregon on or about March 6, 2003, involved TVT. The hold notice was issued on May 22, 2003, and the case settled on or around January 24, 2004.  It is my understanding that documents produced in this case comprised general source materials.  Copies of non-plaintiff specific documents that have been identified from the *Kandell* production have been produced in this case.

    c.     On May 6, 2005, Ethicon issued a document release for all TVT cases releasing all prior litigation hold notices pertaining to TVT.

    d.  *Keeton v. Gynecare, et al.*, Case No. 05-24931-CA 30, filed in Florida in December 2005, involved TVT.  The hold notice was issued on April 27, 2006, and summary judgment was entered in the *Keeton* case on or about August 13, 2007.  It is my understanding that documents produced in this case comprised general source materials.  Copies of non-plaintiff specific documents that have been identified from the *Keeton* production have been produced in Ethicon's Global Production.

36.  Since 2011, Ethicon has issued several reminder litigation hold notices. The most recent notice was sent in June 2016.

37.  While the language in the hold notices varies slightly from notice to notice, all of the notices reflect a company that takes its retention obligations seriously and undertakes them methodically.

38.  For example, the April 2007 hold notice unambiguously instructed employees, "**<u>Do not discard, destroy, or alter in any way any</u>**" documents – regardless of type (e.g., paper, electronic, audio/video files) – pertaining to the subject matters identified (original emphasis). It further provided that "**<u>[f]ailure to preserve these materials could result in Court imposed penalties or sanctions on both the company and/or individual employees</u>**" (original emphasis).

39.  The litigation hold notices are broad in scope, delineating numerous categories of materials that employees must preserve regarding the products at issue, including documents pertaining to (1) Labeling; (2) Pharmacovigilence/Quality/Post-Market Surveillance; (3) Regulatory; (4) Discovery, Research and Development and Quality Engineering; (5) Product Communications; (6) Marketing and Sales Material; (7) Professional Education; (8)

Manufacturing Documents and Equipment; (9) Medical Affairs and Clinical Studies; and (10) Distribution. (See, e.g., February 18, 2011, hold notice)

40.     Taking advantage of technologies that became prevalent between 2007 and 2008, Ethicon established a separate centrally-managed archive repository, which users viewed on their desktops or in their email systems as "litigation hold folders." Employees could move or copy documents into the hold folder to easily retain them for litigation purposes. (With further advances in technology, particularly with respect to the core mail system, the need for a separate third party repository was eliminated by 2013, as discussed in paragraph 58 below.) These litigation hold folders – as well as directives on how to use them – are described in the hold notices.

41.     Ethicon and its corporate parent promoted the well-founded philosophy and practice that an individual is in the best position to understand and manage his or her information and records in the ordinary course of business and under a litigation hold, subject to employee education and oversight. Indeed, in my experience, this is the way the large organizations typically manage their legal holds.

42.     Consistent with the above philosophy, use of the litigation hold folders was not mandatory, according to the Records Manager. Rather, Ethicon provided the litigation hold folders to employees as one of several retention vehicles.

43.     Thus, individuals were provided the flexibility to (and in fact did) manage their information and records in different ways during their employment and at their departure (e.g., using the litigation hold folders, using other folders that are retained, or copying materials to a CD) that proved most conducive to business use, while complying with their obligations under Ethicon's litigation hold.

13

44.     Because this was true both during an individual's employment and in connection with his or her departure, it may explain (as discussed further below) why some former employees had no documents attributed to them in a "custodial file."

<div align="center"><strong>Education and Training on Legal Holds</strong></div>

45.     Ethicon has made an ongoing and conscientious effort to educate its employees as to their responsibilities to preserve information for litigation purposes. In addition to the guidance regarding compliance contained in the hold notices themselves (including, in some notices, a section addressing "frequently asked questions"), Ethicon has conducted training on the hold notices.

46.     As mentioned in the prior section regarding retention in the ordinary course, new employees at Ethicon receive RIM training. This training includes materials specifically directed to developing new employees' understanding of document preservation notices.

47.     For example, the 2011 training explains what a document preservation or legal hold notice is and how to read it. It then tests the employee's understanding of compliance through an exercise. Finally, the training includes a summary discussion of the legal hold requirements. Employees are also required to complete this legal hold training on an annual basis and receive reminder emails if they have not completed the training.

48.     My fact-finding revealed a widespread, albeit uneven, understanding by Ethicon employees of both the existence of pelvic mesh-related litigation hold notices and the substantive requirements of the notices.

**Other Procedures Affecting Record Retention**

49.     Two other procedures are pertinent to Ethicon's compliance with the retention policies and litigation hold notices discussed above.

50.     Ethicon's "North America Process Specification for Onsite Paper/Electronic Clean-up (PS-0000117)" outlines an annual systematic process for reviewing all paper and electronic company records. It provides a records review checklist to determine each document's disposition. The first item on the checklist instructs employees to preserve the document if it has to be retained for litigation.

51.     Ethicon's procedure for terminating/transferring employees (PR 553-003; attached as Exhibit B) provides that managers are responsible for instructing departing employees/contractors to review their paper and electronic files against any Preservation Notices in effect, prior to separation, using the PS-0000117 procedure. Departing employees are responsible for working with their Manager to complete the "Exit Checklist & Certificate of Compliance For Records Disposition" prior to exiting Ethicon in order to appropriately manage their records pursuant to business requirements and active preservation hold notices. If required by the terminating/transferring employee's or contractor's/consultant's Manager/Supervisor, Information Technology representatives are responsible for obtaining the computer files and providing a copy of the materials to the Manager/Supervisor in a CD or other format.

VI.     **PRESERVATION ISSUES HAVE BEEN IDENTIFIED IN CONNECTION WITH PELVIC MESH LITIGATION**

52.     Notwithstanding Ethicon's efforts documented above, during the course of pelvic mesh litigation, the parties have raised issues regarding certain individuals' compliance with

litigation hold notices, as well as the efficacy of certain procedures regarding departing employees with a potential impact on record retention.

53.     In April 2013, I was asked to investigate concerns regarding certain former employees and their compliance with retention procedures and litigation hold notices. My investigation later expanded to other designated former employees.

54.     Specifically, Ethicon was unable to collect and produce electronic data directly from certain former employees who had been identified as custodians of documents potentially relevant to pelvic mesh litigation. In certain cases, hard copy/paper materials were collected and produced on behalf of the individual as part of the individual's "custodial file." In other instances, the loss of the electronic data resulted in the individual's "custodial file" containing no associated documents.

55.     In connection with my fact-finding, I determined that these losses of electronic data occurred despite Ethicon's good faith efforts to ensure compliance with litigation hold notices through policies, procedures, and training. In certain rare circumstances, the electronic data was lost because the former employee misunderstood the requirements to preserve documents, notwithstanding the litigation hold notices issued. In other circumstances (and this was more frequently the case), the employee understood and properly preserved documents while working at Ethicon, but upon the employee's departure or separation from the company, his or her electronic data were not properly transferred to the company. That is, the contents of the employee's hard drive were not preserved because either the manager did not complete the close-out audit or the employee did not communicate the information to be preserved (or incorrectly assumed it would be preserved).

16

## VII.   ETHICON HAS TAKEN RECENT ACTIONS TO PROMOTE COMPLIANCE WITH PRESERVATION OBLIGATIONS

56.    On an ongoing basis, Ethicon examines and assesses its policies, procedures, training and technology relating to record retention, including legal hold obligations, in light of their efficacy, as well as corporate organizational structure and growth, evolving regulatory and legal requirements, technological developments, accepted best practices, and other considerations.

57.    Over the past couple of years or so, Ethicon has implemented a number of measures to secure its ability to meet legal hold obligations going forward, including certain actions that were taken in response to issues identified in connection with the pelvic mesh litigation.

58.    Ethicon has also launched efforts to permit more centralized management and storage of documents that have traditionally resided with individual custodians. For example, in 2013, Ethicon launched Outlook Exchange 2010, which allowed emails to be saved permanently in their customary, centralized, and secure business location. Exchange 2010 removed mailbox size limits and the use of any mailbox "sweep" technology. It also removed the need (and ability) to use local PST folders to save emails that exceeded the centralized mailbox capacity.

59.    Ethicon has also moved to ensure that the data of departed employees will be available for business use or collection for litigation purposes, even years after such employees have left the company. In June 2012, Ethicon began saving all hard drives of departed employees, rather than selected file/email information based on the manager's response to the departing employee's workflow ticket. In 2013, Ethicon modified its asset collection program such that, once an employee is terminated, a notice is automatically sent to the IT department to

retrieve the employee's company laptop. Also in early 2013, Ethicon joined the "IT Safe" program. Under IT Safe, once a former employee's laptop is retrieved, that individual's hard drive is shipped to the IT shared services ("ITSS") group for imaging, and all data on the hard drive is preserved. In 2014, IT Safe was expanded to include sales representatives.[1]

60.     In addition, Ethicon has centralized monitoring of the departure process within the human resources department (HR). Generally, HR will have oversight of the managers and supervisors working with departing employees to confirm managers' awareness and execution of the policies and procedures associated with the departure process, including with respect to departing employees' data.

## VIII. RESPONSES TO SPECIFIC FACTUAL ALLEGATIONS IN PLAINTIFF'S BRIEF

61.     I have been asked to review and respond specifically to certain factual allegations set forth in Plaintiff's brief in response to Defendants' Motion in Limine to Exclude Evidence of Plaintiff's Allegations of Spoliation ("Plaintiff's brief").

62.     Plaintiff identifies 13 former Ethicon employees whose files they claim were not properly retained.

63.     As an initial matter, Defendants have produced over 8,000 documents as part of Kimberly Hunsicker's custodial file. Thus, there was no possible retention issue with respect to her file. In addition, a number of the remaining individuals identified (6 of the 12) departed Ethicon before Ethicon issued its April 30, 2007, TVT hold notice. This includes: Greg Jones

---

[1]     Previously, in December 2012, Ethicon instructed C3i, the third party vendor that manages the hardware of all sales representatives, to permanently retain all hard drive images when a sales representative separates from the company (or receives replacement equipment). In addition, Ethicon has taken a series of steps to further educate sales representatives as to compliance with litigation hold notices.

(departed 2005), Jill Schiaparelli (departed 2005), Charlotte Owens (departed 2005), Laura Angelini (departed 2005), Zenobia Walji (departed 2005), and Patricia Hojnoski (departed 2006; returned in 2008 as contract employee with limited administrative responsibilities for one year).[2]

64.    Plaintiff's claims about the numbers of documents in the "custodial files" of all 12 individuals are also misplaced for the independent reasons explained below.

65.    In this Declaration, I have alluded to the term "custodial file." It has also been used, in a different context, in Plaintiff's brief. The term "custodial file" is properly understood as an organizational and workflow concept in the context of document productions in litigation; that is, it can and should be understood as containing documents that have been collected directly from a particular individual.

66.    Plaintiff's use of the term "custodial file" to suggest that it represents all of the information or documents contributed by that individual that were produced in the litigation is misplaced. As explained below, reliance on the term "custodial file" in that context is based on a misconception of the manner in which individuals create, manage, transmit, and share information and documents in a modern corporate environment, such as within Ethicon.

67.    As noted above, in a modern corporate environment, technology infrastructure is increasingly designed to encourage users to create and manage documents and information in centrally stored and managed locations, such as Microsoft SharePoint sites, group or department shares, databases, and other electronic systems, rather than on a drive to which only a single user has access.

---

[2]    Based on my review of pertinent deposition testimony and personnel files, Plaintiff mischaracterizes the Ethicon tenures and/or pelvic mesh involvement for Jill Schiaparelli. While Plaintiff describes her tenure as 2000 - 2007, Ms. Schiaparelli transferred from Ethicon to Ethicon Endo-Surgery in 2005.

68.     This is true of Ethicon. Indeed, as discussed at the beginning of this Declaration, the key design, regulatory, marketing, complaints and other post-market surveillance documents regarding Ethicon's pelvic mesh products at issue in pelvic mesh litigation are maintained centrally at Ethicon, and have been collected and produced, apart from any "custodial files."

69.     Further, the use of central filing locations such as L drives by many workgroups and associated individuals indicates that even drafts or non-final work product of a particular individual may be stored in that shared location, and therefore be available for collection, although not necessarily always attributable to that individual for collection and production purposes.

70.     In addition, given the collaborative working environment of Ethicon and the fact that emails necessarily have both a sender and a recipient (or recipients), many documents of a custodial nature that are in the possession of one individual are also likely to be in the possession of other individuals, some of whom may work in the same functional or subject matter area. Plaintiff in her brief complains that the "custodial files" of various individuals contained no or very few documents. But in fact basic searches of names and/or email addresses show that substantial numbers of email communications and attachments to or from each of the 9 individuals cited by Plaintiff have been produced and can be located within the Global Production. These emails are identified on the schedule below:

| Identified Individual | Approx. number of produced emails and attachments to/from Identified Individual |
|---|---|
| Laura Angelini | 7,264 |
| Renee Selman | 9,096 |
| Ramy Mahmoud | 3,829 |
| Charlotte Owens | 7,117 |
| Jennifer Paine | 5,499 |
| Price St. Hilaire | 19,206 |
| Patricia Hojnoski | 4,636 |
| Allison London Brown | 16,842 |
| Zenobia Walji | 6,323 |
| Jill Schiaparelli | 4,079 |
| Gregory Jones | 1,421 |
| Troy Mohler | 3,512 |

71.     Because of the way individuals in a modern corporate electronic environment create, manage, transmit and/or share information and documents, it is very unlikely that any "custodial file" would ever include all documents created or received by that custodian, even assuming perfect compliance with litigation hold procedures. Unlike a broker-dealer workplace, in which email "journaling" is mandated for regulatory compliance purposes, Ethicon, like other corporate email users that do not journal, could not possibly perfectly capture every email. However, like other medical device companies, Ethicon has policies and procedures to preserve emails that are classified as part of its regulatory framework, regardless of legal hold status. Indeed, as mentioned above, centralized collections of materials such as the Design History File and 510(k) files contain emails, and it is not disputed that Ethicon has produced to Plaintiff those centralized collections, including emails.

72.     In addition, Plaintiff points to Kimberly Hunsicker's testimony regarding her belief that documentation related to clinical affairs should be retained for ten years beyond the

life of the franchise.  Plaintiff's interpretation of that testimony as applying to *all* documents from individuals in clinical affairs, including routine e-mails, is inconsistent with Ethicon's written record retention protocols discussed in paragraphs 20-29 above.  Accordingly, I confirmed with Ms. Hunsicker that the documentation she referred to in her testimony applied to materials that are part of the trial master file, rather than all emails or documents related to clinical affairs.  The trial master file has been retained pursuant to Ethicon's record retention policies.  In addition, it was collected and produced as part of Ethicon's Global Production.

73.      There are many sources of an employee's documents, only one of which is his or her "custodial file." This is particularly true for custodians who have departed the company prior to collection. Indeed, the concept of a "custodial file" as applied to a former employee is a misnomer, as the documents of the former employee typically are transferred or moved to the custody of someone other than the former employee who has departed.

74.      Thus, even where an individual's "custodial file" does not contain any documents, as shown above, it is possible (and in fact is the case here) that substantial numbers of that individual's documents (including email communications) have been collected and produced, from file shares, databases, and other enterprise electronic systems, as well as from other individuals' "custodial files."

75.      Other findings from my investigation also fail to support the notion that documents "missing" from particular individuals' "custodial files" were necessarily relevant. To the contrary, as explained below, Ethicon's collection methodology was designed to maximize the production of relevant materials from multiple sources.

76.     As an initial matter, Ethicon's collection process has several layers of built-in redundancies. Ethicon's collection included both central sources and custodians, and as to custodians, multiple individuals within functional areas were targeted for custodial collection.

77.     For example, while it is true that fewer than 2,000 documents were produced as part of the "custodial file" of one of the more than 40 individuals working in the area of marketing on whom custodial collections were performed (Laura Angelini), more than 440,000 documents were produced in the "custodial files" of other individuals employed in a marketing capacity, not to mention the marketing documents produced from central, group, or shared sources.  Plaintiff's presumption that key marketing documents were lost simply does not follow from the observation that Laura Angelini's "custodial file" contained fewer documents than they might have expected. Likewise, the "custodial file" of Charlotte Owens, who worked in Medical Affairs, contained no documents. But more than 320,000 documents from 20 other custodians employed in a medical or clinical capacity have been produced.

78.     These redundancies should also be considered in evaluating Plaintiff's complaints about Patricia Hojnoski. Patricia Hojnoski was merely one of more than 20 different individuals working in Regulatory Affairs who was identified for custodial collection. Voluminous regulatory materials have been produced in connection with other "custodial files," not to mention central source materials.

79.     The redundant processes that Ethicon has built into its document collection is further demonstrated by looking at the collection and production history of three emails:

a.      Exhibit C to this Declaration is an email from a Professional Education Manager to several recipients, including Price St. Hilaire, announcing a cadaver lab training course for surgeons. Although this email was not

collected directly from Price St. Hilaire, *it was collected from eight other custodians* and produced to Plaintiff.

b.      Likewise, Exhibit D is an email from Raimo Sump, an Engineer for Procedural Implants R&D, to several recipients, including Charlotte Owens, providing meeting minutes to the TVT Secur Team. Although this email was not collected directly from Charlotte Owens, *it was collected from five other custodians* and produced to Plaintiff.

c.      Similarly, Exhibit E is an email from Brian Luscombe, the United States Product Director for Pelvic Reconstructive Surgery, to several recipients, including Troy Mohler, providing meeting minutes to the Incontinence & Pelvic Organ Prolapse Brand Team. Although this email was not collected directly from Troy Mohler, *it was collected from eight other custodians* and produced to Plaintiff.

80.     These three emails were not "lost" simply because they were not associated with the "custodial files" of Mr. St. Hilaire, Charlotte Owens, or Mr. Mohler. To the contrary, each of these emails was collected from numerous other custodians and were produced to Plaintiff. Plaintiff can see the content of each of these emails. Plaintiff can also see that the first email was sent to Mr. St. Hilaire, among others, that the second and third emails were sent to Ms. Owens and Mr. Mohler, respectively, as well as other individuals. In short, Plaintiff already has the same information regarding these emails that she would have had in the event that Ethicon has associated the emails with the "custodial files" of Mr. St. Hilaire, Ms. Owens, or Mr. Mohler.

81.     Plaintiff indicates in her brief that the production of small numbers of documents in the custodial files of certain individuals means that relevant documents must have been lost.

Based on my investigation, this suggestion is unfounded as applied to a number of the individuals Plaintiff identified.

82.     First, Plaintiff's suggestion is particularly unfounded with respect to current and former sales representatives.  I spoke with a number of different sales representatives in the course of my investigation and each emphasized that the role of a medical device sales representative at Ethicon is not document-intensive.

83.     Accordingly, it is unsurprising to me that, as compared to non-sales representative employees, relatively few documents were directly collected from sales representatives such as Troy Mohler (who has been identified by Plaintiff), and relatively few documents determined to be relevant were produced as part of his custodial file.

84.     Further, as to Troy Mohler in particular, he testified unequivocally that he read, understood, and complied with Ethicon's record retention policies and legal hold notices and did not destroy any documents that should have been preserved.  He also testified that he provided his documents to Ethicon upon his departure.  These documents included marketing, training, and professional education materials which would have been produced from central sources, such as GGM Blue.

85.      In addition, the sworn testimony of other individuals specifically identified by Plaintiff (*see* ¶ 62) undercuts the presumption that these individuals would have had significant volumes of documents relevant to pelvic mesh litigation that cannot be located from other sources. For example:

      a.     Renee Selman – Ms. Selman testified that, due to her position, she was not

the author of many documents and that such documents likely would be associated with other individuals' "custodial files."

b.      Jennifer Paine – Jennifer Paine testified that she was not surprised her custodial file did not have many documents because she had very limited involvement with TVT.

86.     Finally, in my fact-finding, I did not identify a single instance in which an Ethicon employee selectively and intentionally destroyed documents known to be relevant to the pelvic mesh litigation.

87.     Rather, any losses of data were attributable to some type of misunderstanding by an employee and/or a miscommunication between a departing employee and his or her manager.

88.     This is true of the disposition of Ms. Selman's hard drive. As Plaintiff acknowledges, Ms. Selman was aware of the litigation hold and complied with it during her time at Ethicon. The loss of her data occurred when she and those who were responsible for her materials upon her departure failed to identify to IT the need to retain her data in connection with applicable legal holds. Instead, they incorrectly assumed that the data would be held even in the absence of their identifying that need.

89.     These misunderstandings and miscommunications led to losses of data that were not at the custodian's discretion – there was no deletion of specific emails, email folders, or documents regarding any particular subject matter.

90.     Moreover, as demonstrated above, it is reasonable to expect that the vast majority of any relevant documents not found in a particular individual's custodial file were collected and produced from central sources and/or other individuals' "custodial files."

I represent that the foregoing statements are true under the penalties of perjury.

James P. Mittenthal

Dated: May 15, 2017

# Exhibit A



































**WWRIM**
Worldwide Records & Information Management

Records and Information Management Training

**Managing Electronic Records**

**Retention Time for E-Mails**

E-mails that contain content on multiple topics will need to be retained based on the content that has the longest retention time.

For example, an e-mail is used to discuss two different topics: Topic 1 "talks" about the project plan for upgrading to an electronic store ordering system, and Topic 2 "talks" about the tax implications of buying a new building. In this situation, although the retention for the content around Topic 1 (upgrading the system) may be 5 years, the retention for the content in Topic 2 (buying a new building) is at least 10 years; therefore, this e-mail must be retained for at least 10 years to ensure the content with the longest retention time meets its retention requirements.

Also, Document Preservation Notices apply to records on all types of media – electronic, paper, and film-based, etc. – unless otherwise noted on the actual Preservation notice. So using the example above regarding the e-mail containing a discussion of two different topics (project plan for the electronic store ordering system and tax implications of buying a new building), if you received a Document Preservation Notice related to any records pertaining to buying the new building, you would need to retain this entire e-mail according to the instructions listed on the actual Document Preservation Notice.

**From:** Mary Lamb
**Sent:** Thursday, December 10,2009 2:49 PM
**To:** John Doe
**Subject:** Some news on 2 different topics                    Topic 1

Here is an update on the Electronic Store Ordering System - we need to have another meeting with the vendor to discuss the timing of the final product.

I also have some news regarding buying the old building on Main Street to house our over stock of widgets. We've analyzed the situation and have decided that it makes sense to buy this building both from a tax perspective and to address an immediate bussiness need to store our overstock of widgets.

*Mary Lamb*

*Johnson&Johnson*   Click **Next** to continue.

Back        Page 15 of 27        Next



**WWRIM**
Worldwide Records & Information Management

Records and Information Management Training

**Document Preservation Notice**

**What is it?**

During the course of business your company may be involved in litigation or government inquiries. These cases often require the company to produce records related to the case. In these instances, the J&J Law Department will instruct the company Records Manager to send out a Document Preservation Notice, also called a Document Hold Notice.

The Document Preservation Notice describes specific records that must be kept, even if they would otherwise be destroyed. For example, Convenience Information can't be destroyed if it is relevant to a Document Preservation Notice.

When you receive a Document Preservation Notice, you are required to comply with the request. Be sure to read all sections of the Document Preservation Notice carefully!

It's also important to note that you will receive Document Preservation Notices only from your Records and Information Management (RIM) department. On some rare occasions you may receive the notice directly from the J&J Law Department. However, if you have obtained a Document Preservation Notice from someone other than your company's RIM department or the J&J Law Department, please contact your Records Manager immediately.

In addition, only your RIM department, and on rare occasions the J&J Law Department will notify you when a Document Preservation Notice has been released and is no longer active.

**J&J LAW DEPARTMENT**
**DOCUMENT PRESERVATION**
**NOTICE**
**DO NOT DESTROY**
**SPECIFIED DOCUMENTS**

[Note: For a comprehensive list of individuals/departments in your company or J&J headquarters department, please visit the following website: http://documenthold.org.com and select the appropriate operating company or corporate department.]

June 01, 2008

RE:   Hold Notice for XXX  v. YYY, Inc. et al.
        Matter No.: 32008

        Company XXX, Inc. has filed a declaratory judgment action seeking to invalidate

Company YYY's U.S. Patent No. 3,333,333

        In connection with this matter, it is vital to preserve all documents relating in any way to the below listed subject matters **(attached as Exhibit A)** until century written notice is received from the J&J Law Department.  **Failure to preserve these materials could result in Court imposed penalties or sanctions on both the company and/or individual employees.**

        **Do not discard, destroy or alter in any way any of the documents (electronic or paper) described below.  Please ensure that these instructions are followed.**

        Please save and preserve all documents in categories described below, including emails and attachments, drafts, letters, memos, notes (handwritten or typed), reports and tables (either printed or on the computer), slides or other graphics, data stored on

*Johnson&Johnson*   Click **Next** to continue.

Back        Page 16 of 27        Next

























**Records and Information Management Training**

**Quiz**
Introduction

For the final quiz, you will be required to complete exercises similar to those you have already seen, however using different scenarios. Read each item carefully.

A score of 80% (8 correct out of 10) is required to pass the quiz. You will have 3 opportunities to pass the quiz. If you fail the third time, you will need to retake the course from the beginning.

You can review any topic from the **Menu** before getting started.

If you are ready to take the quiz now, click **Next**.

Good luck!

This is the first attempt out of 3. You need 80 percent to pass.

Johnson & Johnson    | Click **Next** to continue.

Back    Page 27 of 27    Next

# Exhibit B



# COMPANY PROCEDURE FOR
# TRANSFERRING / TERMINATING EMPLOYEES AND CONTRACTORS

### REVISION HISTORY FOR PR553-003

| Revision # | Summary of Change | Change Order # | Originator |
|---|---|---|---|
| 12 | Added Mentor Santa Barbara to the Section 2: Scope.<br><br>Updated Employee / Contractor Role in Section 4: Roles and Responsibilities.<br><br>Changed references to the Ethicon Change Control System (ECCS) to Document Control System.<br><br>Updated Appendix I references of the Litigation Vault to Litigation Hold folder.<br><br>Updated Appendix I Items #1 & 18 in order to align with changes released by Johnson & Johnson Corporate Worldwide Records & Information Management to RIMS-5 Inactive Records & Information Storage Standard and RIMS-9 *Management of Records and Information of Departing Associates Standard*. | CO-0036329 | W. Patire-Singer |
| 11 | Major re-write to improve clarity to the end users & to better align to the new J&J Corporate Worldwide Records & Information (WWRIM) Management of Records and Information of Departing Associates Standard (RIMS-9). Form & Certification have also been modified to be completed electronically rather than manually. | CO-0029899 | W. Patire-Singer |
| 10 | Revised to edit the Scope section. Add Guaynabo departments for implementation. | CO-0024320 | W. Patire-Singer |

ETH.MESH.07983031



Document Name (#):   PR553-003

Revision:   12

## 1. PURPOSE

This procedure describes the process by which all employees or contractors who leave ETHICON are required to review all of their paper and electronic records, prior to their departure. In order to manage the Records and Information, departing employees and/or contractors need to assure that their records and information are reviewed and dispositioned in compliance with the ETHICON Records Retention Schedule (RRS), and active Preservation Hold Notices.

## 2. SCOPE

This process applies to the following ETHICON locations:
- Cornelia, Georgia
- Guaynabo, Puerto Rico
- Juarez, Mexico
- Raleigh, North Carolina
- San Angelo, Texas
- San Lorenzo, Puerto Rico
- Santa Barbara, California
- Somerville, New Jersey

## 3. DEFINITIONS, ACRONYMS AND ABBREVIATIONS

Reference terms used in this document are found in PS-0000971 *Franchise Process Specification for the Records Management Program Glossary.*

## 4. ROLES AND RESPONSIBILITIES

| Roles and Responsibilities | Description |
|---|---|
| **Human Resources Vice President** | Provide the necessary guidelines and instructions for terminated/transferred employees & contractors via the ETHICON Exit Processes. |
| | Transfer HR files to other J&J Human Resources Departments as employee transfer situations occur. |
| | Work with ComplianceWire Administrators to facilitate consistent training on this document for Site Records Management staff, Records Coordinators, and Managers/Supervisors and any other site specific relevant targeted training audience. |
| | Adjust this procedure and/or provide feedback on any areas of process to respond to changing business needs. |

ETH.MESH.07983032



Document Name (#):   PR553-003

Revision:   12

| Roles and Responsibilities | Description |
|---|---|
| **Manager/ Supervisor (includes District/ Divisional Managers)** | Ensure that:<br><br>1) Records of all departing direct reporting individuals are dispositioned appropriately per established Company Procedures, active Preservation Hold Notices and per the requirements of this Procedure & Certification.<br><br>2) The terminating or transferring individual fully understands how to review and disposition their records, where to locate the Records Retention Schedule, Preservation Hold Notices and other relevant Record Review and Disposition related Documents.<br><br>3) Instruct IT that the departing individual's records need to be taken off of the computer and put on a CD or equivalent technology within 30 days when an individual is unable to perform their own records disposition prior to their departure to avoid their files being re-imaged prior to dispositioning the records. Manager/Supervisor then is responsible for performing the records review & disposition. |
| **Employee / Contractor** (Consultant/Contractor Kelly Temp, or other Temporary Workers) | Work with their Manager to complete the Exit Checklist & Certificate of Compliance For Records Disposition (APPENDIX I) prior to exiting ETHICON in order to clean-up and appropriately disposition their records per established Company Procedures and active Preservation Hold Notices.<br><br>If the temporary worker is unable to do this prior to their departure (e.g. if the departure is short notice), then it is the responsibility of the Manager/Supervisor to whom this person reported to disposition their records and disconnect their system/security authorizations.<br><br>The departing employee or contractor may take with them upon departure any personal notes provided these documents, in their entirety, were (1) not prepared, used for, or communicated in the course of transacting Ethicon business, and (2) not subject to an active Preservation Hold Notice for any reason. |
| **ITS Representatives** | Obtaining the terminating/transferring employee's or contractor's /consultant's computer files and provide a CD of the individual's files if required by their Manager/Supervisor.<br><br>Ensuring that computer Accounts are disabled within 30 days and that files are removed within 90 days. |

## 5.  MINIMUM REQUIREMENTS
The Manager and Employee / Contractor must follow & complete the process outlined in **Appendix I**.

ETH.MESH.07983033



Document Name (#):   PR553-003

Revision:   12

## 6.  APPENDICES

| Appendix | Appendix Name |
|---|---|
| **Appendix I** | Transferring/ Terminating Employee / Contractor Checklist & "Certificate of Compliance for Records & Information Disposition" |

ETH.MESH.07983034



Document Name (#):   PR553-003

Revision:   12

## APPENDIX I:   TRANSFERRING / TERMINATING EMPLOYEE / CONTRACTOR CHECKLIST & "CERTIFICATE OF COMPLIANCE FOR RECORDS & INFORMATION DISPOSITION"

### Management's Responsibility PRIOR to the Employee/Contractor leaving the company:

☐ 1.   Instruct employee/contractor to review his or her paper and electronic files against approved records retention schedules, and any Preservation Notices in effect in order to be sure they understand where and how to find and follow the Records Retention Schedule and Preservation Hold Notices in order to perform their records review. **The 4 types of Litigation are: Employment, Product, Patent and General Litigation.** The link to the Johnson & Johnson Legal Hold Notice Site is available on the ETHICON Records Management Intranet Portal and on the ETHICON Somerville Human Resources Exit Process Portal. Any records, paper or electronic, that are under litigation, must be labeled (Case name of Litigation) and forwarded to their manager.

All electronic Outlook Software records (Word, Excel, PowerPoint, Access, etc.) must be moved to the Litigation Hold  folder on your desktop per the instructions in the respective, relevant Preservation Hold Notices. Move electronic files subject to Preservation Hold Notices to the Litigation Hold as follows:

❖ **Paper Records**-

All paper records that are under litigation should be flagged and forwarded to your immediate manager.

❖ **Electronic Records**-

All electronic email records must be moved to the Litigation Hold folder in your Microsoft Outlook Inbox per the instructions in the respective relevant Preservation Hold Notices.

All electronic Outlook Software records (Word, Excel, PowerPoint, Access, etc.) must be moved to the Litigation Hold folder on your desktop per the instructions in the respective, relevant Preservation Hold Notices.

• Ensure employee/contractor references PS-0000117 – *Process Specification for Onsite Paper/Electronic Records Clean-up.* Follow all instructions in PS-0000117 including completion of the electronic records clean-up tracker. These can be found in the Document Control System  or on the Records Management Intranet portal.

• Records and information determined to be eligible for destruction or deletion after this review process shall be:

   o   Destroyed at that time in accordance with ETHICON Procedures OR

   o   Transferred to the Supervisor to retain until ETHICON's annually scheduled Records Clean-up event, at which point those records will be re-reviewed, re-dispositioned and destroyed, as appropriate. OR

   o   Destroyed/deleted at that time with written approval by the supervisor.

• Once the employee/contractor has completed their paper and electronic review of all records, then instruct the individual to transfer the remaining records to management or their management representative.

> **NOTE: Do not move email and files from C, H, and other drives to department shared drives for permanent storage.**

☐ 2.  If the employee/contractor has staff reporting to them, then instruct that all department staff's personnel files are transferred to the newly appointed manager.

ETH.MESH.07983035



Document Name (#):   PR553-003

Revision:   12

☐ 3. The individual's supervisor will ensure, commensurate with the risk, that all appropriate passwords are changed immediately. If a resigning/ transferring/ terminated employee or contractor is responsible for the system (application) administration of ANY ETHICON System (application), then the individual's supervisor is responsible for ensuring the individual's:

- System Administrator Rights need to be deleted immediately for each system to which they have System Administrator rights.

- Password(s) is/are changed immediately.

☐ 4. If the employee/contractor has access to Document Control System, then instruct the individual to transfer all pending document change packages to another permanent individual with the required Document Control System role or request that they cancel the change packages. Contact WW Quality Systems or your local Quality System associate for assistance if required.

- If the employee is identified as a Document Owner, then a new document owner must be identified and the required forms be completed.  Refer to PR-0000001, Company Procedure for the ETHICON Document Management Process, for details.  Complete FM-0000001, Document Control System Document Ownership Transfer Form, and process per instructions.

- If the employee is  a Document Control System Approver, then they must ensure that an alternate approver is identified for them.  If the employee functions in the role of Document Control System Implementer, they must ensure the Implementer role is transferred to an appropriate associate within their functional group.

☐ 5. If the employee/contractor has access to the Corrective and Preventative Action (CAPA) System, then instruct the individual to take the necessary steps to transfer the CAPA ownership of all **pending** CAPA's to another individual to be identified by the Manager.

If the employee is in the Approver role in CAPA, they must ensure that all pending approvals are executed prior to termination or take steps to transfer the approval responsibility to another appropriate approver in the CAPA System.

☐ 6. If the employee/contractor has access to the Non-Conformance Report (NCR) System, then instruct the individual to work with the NCR Site Leader to transfer all pending NCR's under his/her name as an NCR Owner and/or Product Control Owner to another individual with the required NCR role.

If the employee is identified as having an Approver Role in the NCR System, then ensure all the NCR's pending his/her approval are identified and reassigned by the NCR Site Leader.

☐ 7. **For Field Sales Management Only:** If your field based employee did not complete the records clean-up and did not sign the Certificate of Compliance prior to departure, then the Field Service Equipment Vendor will copy the electronic records on to a CD and send a copy to the District Manager or Management Representative for review and disposition in accordance with this policy. Utilize the Field Sales Equipment vendor to obtain the terminated/ transferred field sales employee's laptop or any other company assets that were issued to the individual back to C3I.

☐ 8. **For United States Based Human Resources Employees / Contractors Only:**  <u>No Human Resources related records can be deleted or discarded.</u> Manager needs to send the computers to the **Global Site Services Lead** so a copy of the hard drives can be made before the computer can be re-imaged. This process step is required in order to support the Gutierrez, Morgan, Brown & Marshall v. Johnson & Johnson Employment Litigation Case.

☐ 9. Forward the employee's personnel file to the Human Resource Department if the employee is leaving or transferring to another J&J Company. If the employee is transferring to another department within ETHICON, forward the personnel file to the new manager.

- All Contractor department files remain in the department and should **not** be sent to Human Resources.   These files are to be retained per the "Consultant/Contractor Contract & Supportive Documentation" Record Title on the Administrative Records Retention Schedule.

ETH.MESH.07983036



Document Name (#): PR553-003

Revision: 12

- **UNTIL FURTHER NOTICE, <u>ALL PERSONNEL FILES, INCLUDING COMPENSATION INFORMATION ARE UNDER PRESERVATION HOLD - DO NOT DESTROY OR REMOVE DOCUMENTS FROM THE FILE.</u>**

☐ 10. The employee/contractor is required to return all ETHICON owned software, and equipment upon the end of employment.

☐ 11. If any records were password protected, then the passwords should be communicated to their Manager before leaving.

☐ 12. Manager is to identify if the employee/contractor is an authorized user for a contracted offsite Records Storage Vendor for the retrieval of offsite records such as Iron Mountain, Angelo Archives, etc. If yes, then the manager must notify Site Records Manager that the individual is leaving the company and must be removed from the Contracted Offsite Records Storage Vendor authorization list. Has the employee/contractor retrieved any records from the offsite facility? If yes, then instruct the individual to identify & document the location of those records (boxes).

☐ 13. Instruct employee/contractor to return laboratory notebooks to Managers.

☐ 14. Instruct employee/contractor to identify any company paid services that they subscribe to. The Manager must remove the individual from the respective subscription(s).

☐ 15. Remove employee's/contractor's name from any distribution lists.

☐ 16. A (Service Request Management) SRM Form must be completed to request the following:

- Delete inactive accounts such as NT id, Mailbox and specific applications with user access.

- Identify if the employee/contractor has access to any other SharePoint Sites, shared drive systems, etc. If so, manager should request removal from those respective lists and group shares.

- Coordinate the pick-up all ETHICON equipment such as laptop, blackberry, printer, etc. that is in the possession of the departing or transferring individual.

☐ 17. Manager/Supervisor of terminated/transferring employee/contractor must complete the Certificate of Compliance Form for Records Disposition to certify that the individual's records have been reviewed and that proper disposition has been determined within 30 day. (**Appendix I**). Submit or retain the completed Certificate of Compliance Form for Records Disposition as it instructs based upon whether the individual is an employee or a contractor.

- **<u>For the Employee:</u>** The original Certificate of Compliance must be filed in the Employee's Personnel File along with the Exit Checklist and forwarded to Human Resources.

- **<u>For the Temporary Assignment Employee transferring back to their original J&J Operating Company location:</u>** The original completed Certificate of Compliance is retained in the Human Resources file of the ETHICON site where the Associate worked on temporary assignment.

- **<u>For the Consultant:</u>** The completed Certificate of Compliance is retained in the consultant/contractor Department file. This will remain in the department for the applicable Retention Period on the current approved Records Retention Schedule.

☐ 18. In the event the employee/contractor does not complete these steps before leaving, their management or their management representative must, within 30 days after the individual has left the company:

- Assume responsibility for this review, transfer and disposition procedure.

- Request that IT create a copy of the Associate's electronic records on to a CD-Rom via an SRM request for the CD-Rom to be forwarded to them promptly for disposition.

ETH.MESH.07983037



Document Name (#):   PR553-003

Revision:   12

☐ 19. If the departing employee / contractor served as a Records Coordinator or a Department Head, then notify the Site Records Manager of this individual's departure and who their replacement will be who will assume these responsibilities for the Department moving forward.

ETH.MESH.07983038

 **ETHICON**, INC.
a Johnson-Johnson company

Document Name (#):   PR553-003
Revision:   12

**ETHICON TRANSFERRING / TERMINATING EMPLOYEE / CONTRACTOR**
# CERTIFICATE OF COMPLIANCE FORM FOR RECORDS DISPOSITION

**NAME OF EMPLOYEE OR CONTRACTOR:**  _____
*(PRINT Name)*

**Employment Status:** *(Check One)*   ☐ Employee      ☐ Contractor

**Division Worked In:**  _____
*(Check One)*
☐ Non-Human Resources Employee
☐ Human Resources Employee (None of their files can be destroyed or dispositioned.)

**Departure Reason:** *(Check One)*
☐ Transfer to another Johnson & Johnson Operating Company
☐ Transfer to another ETHICON Site/Division
☐ Employment Termination
☐ Contract Expiration
☐ Contract Termination

**Termination Circumstance:** *(Check One)*
☐ Voluntary Departure
☐ Non-Voluntary Departure

# CERTIFICATION:

I hereby confirm that, to the best of my knowledge, all paper & electronic records owned by

_____ have been reviewed and subsequently either dispersed and/or
(Name of Employee / Contractor)

disposed of per the requirements of:

- PS-0000117 ETHICON Onsite Paper / Electronic Records Clean-up
- PR-0000018 ETHICON Records Retention Schedule
- Active Preservation Hold Notices for Product, General, Employment and Patent related litigations

_____   _____   _____
*PRINT MANAGER'S NAME*   *MANAGER'S SIGNATURE*   *DATE*

**ROUTING INSTRUCTIONS:**
- For Terminating Employees:  Include this completed & signed document in the Employee's Personnel File and forward with the completed Exit Checklist to Human Resources.
- For Transferring Employees: The individual's personnel file transfers to either the new department or to the HR Department on behalf of the terminating or transferring employee.
- For Contractors:  Retain this completed & signed document in the Contractor's Department file.  This will remain in the department for the applicable Retention Period per the requirement listed on the approved Company Records Retention Schedule.

# Exhibit C

**From:** Meek, Andrew [ETHUS] <AMeek@ETHUS.JNJ.com>
**Sent:** Fri, 31 Aug 2007 15:13:14 GMT
**To:** DL-ETHUSSO EWHU DMs <DL-ETHUSSOSLSSPECIALTYDMs@ETHUS.JNJ.com>; Pattyson, Bart [ETHUS] <BPATTYSON@ETHUS.JNJ.com>; Gatewood, Jim [ETHUS] <JGatewoo2@ETHUS.JNJ.com>; Zipfel, Robert [ETHUS] <RZipfel@ETHUS.JNJ.com>; Yu, Kyung [ETHUS] <KYu@ETHUS.JNJ.com>; Parisi, Paul [ETHUS] <PParisi@ETHUS.JNJ.com>; St. Hilaire, Price [ETHUS] <PSTHILAI@ETHUS.JNJ.com>; Barendse, Stevan [ETHUS] <SBarends@ETHUS.JNJ.com>; Meek, Andrew [ETHUS] <AMeek@ETHUS.JNJ.com>
**Subject:** Nov 3 Cadaver Lab - Dallas, TX

---

DMs/RSDs,
Please forward to you teams.

I am excited to announce the debut of a new course on November 3 in Dallas, TX - Advanced Pelvic Floor Course - Level 1. The surgeon targets for this course are plicators, biologic users, flat mesh users with little experience, etc.

The goal for this lab is to train these doctors to prepare them for using mesh for pelvic floor repairs. The content that will be covered is as follows:

1. Pelvic Floor Anatomy, to include anatomic dissection
2. Diagnosis of pelvic floor defects, levels of support, staging
3. Graft selection criteria for augmented repairs
4. Graft implantation techniques
5. Handling complications
The cadaver lab will focus on anatomy, dissection, and placement of GYNEMESH.
Again, the targets for this course are surgeons with little or no experience using mesh with pelvic floor repairs. The experience gained at this level 1 course will prepare these doctors to possibly take a level 2 course in the future, which will feature Prolift.
This course is fully funded and will not impact region/division PE budgets. It is open to all regions. The course is posted on-line and the brochure is attached. Good luck!

Andy

Andy Meek
Professional Education Manager
ETHICON Women's Health & Urology
a Johnson & Johnson Company
Cell: 817-455-4993
Fax: 817-416-0467
Vmail: 800-888-9234 ext.5219

ETH.MESH.00467439

# Exhibit D

**From:** Sump, Raimo [ETHUS]

**Sent:** Fri, 03 Jun 2005 15:23:08 GMT

**To:** Borkes, Gary [ETHUS] <GBorkes@ETHUS.JNJ.com>; Burns, Janice [ETHGB] <JBURNS5@ethgb.jnj.com>; Cantimbuhan, Risa [ETHUS] <RCANTIMB@ETHUS.JNJ.com>; Castro, Manuel [ETHUS] <MCastro7@ETHUS.JNJ.com>; Everett, Jeffrey [ETHUS] <JEverett@ETHUS.JNJ.com>; Heupel, Dr. Martin [ETHDE] <MHeupel@ethde.jnj.com>; Holste, Dr. Joerg [ETHDE] <DHOLSTE@ethde.jnj.com>; Hoyer, Henning [ETHDE] <HHoyer@ethde.jnj.com>; Komarnycky, Peter [ETHUS] <PKomarny2@ETHUS.JNJ.com>; London Brown, Allison [ETHUS] <ALondon@ETHUS.JNJ.com>; Mahar, Kevin [ETHUS] <KMahar@ETHUS.JNJ.com>; McDivitt, James [ETHUS] <JMCDIVIT@ETHUS.JNJ.COM>; Owens, Charlotte [ETHUS] <COwens2@ETHUS.JNJ.com>; Quandt, Thorsten [ETHDE] <TQUANDT@ethde.jnj.com>; Sinclair, Naomi [ETHUS] <NSincla1@ETHUS.JNJ.com>; Smith, Dan [ETHUS] <DSmith@ETHUS.JNJ.com>; Sump, Raimo [ETHUS] <RSump1@ETHUS.JNJ.com>; Taggart, Donna [ETHUS] <DTaggart@ETHUS.JNJ.com>; Vuilliomenet, Gilles [JNJCH] <gvuillio@jppch.jnj.com>; Wierzchacz, Joachim [ETHDE] <JWIERZCH@ethde.jnj.com>

**CC:** Barbolt, Thomas [ETHUS] <TBarbolt@ETHUS.JNJ.com>; Bell, Steve [ETHIT] <SBell6@ethit.JNJ.com>; Bobertz, Ed [ETHUS] <EBobertz@ETHUS.JNJ.com>; Bogardus, Cheryl [ETHUS] <CBogardu@ETHUS.JNJ.com>; Burkley, Daniel [ETHUS] <DBurkley@ETHUS.JNJ.com>; Ciarrocca, Scott [ETHUS] <SCiarro2@ETHUS.JNJ.com>; Colon, Aixa [ETHUS] <AColon2@ETHUS.JNJ.com>; Crosby, Cindy [ETHUS] <CCrosby@ETHUS.JNJ.com>; De Ment, Aaron [ETHUS] <ADement@ETHUS.JNJ.com>; Deng, Meng [ETHUS] <MDENG@ETHUS.JNJ.com>; Elbert, Katrin [ETHUS] <KElbert@ETHUS.JNJ.com>; Evans, Paula [ETHGB] <PEVANS2@ethgb.jnj.com>; Ewer, Chris [JNJCH] <cewer1@jppch.jnj.com>; Guidry, Cyrus [ETHUS] <CGUIDRY2@ETHUS.JNJ.com>; Henkelmann, Ulrich [ETHDE] <UHenkelm@ethde.jnj.com>; Hintze, Axel [ETHDE] <AHINTZE@ethde.jnj.com>; Hojnoski, Patricia [ETHUS] <PHojnosk@ETHUS.JNJ.com>; Hunsicker, Kimberly [ETHUS] <KHunsick@ETHUS.JNJ.com>; Hutchinson, Richard [ETHUS] <RHutchin@ETHUS.JNJ.com>; Kaufhold, Thomas [ETHDE] <TKAUFHOL@ethde.jnj.com>; King, Jean [ETHUS] <JKing22@ETHUS.JNJ.com>; Kisielnicki, Marc [ETHDE] <MKisieln@ethde.jnj.com>; Klar, Manfred [ETHDE] <mklar@ethde.jnj.com>; Leclair, Nancy [ETHUS] <NLeclair@ETHUS.JNJ.com>; Leibowitz, Rebecca [ETHUS] <RLeibowi@ETHUS.JNJ.com>; Meister, Andreas [ETHDE] <AMeister@ethde.jnj.com>; Neveling, Dr. Guenter [ETHDE] <GNevelin@ethde.jnj.com>; Nichols, Linda [ETHUS] <LNichol2@ETHUS.JNJ.com>; Oliveira, Clarindo [JNJCH] <colivei6@jppch.JNJ.com>; Parisi, Paul [ETHUS] <PParisi@ETHUS.JNJ.com>; Pierrot, Terrylyn [ETHUS] <TPierrot@ETHUS.JNJ.com>; Plate, Kerstin [ETHDE] <KPlate@ethde.jnj.com>; Raddatz, Guenter [ETHDE] <GRADDATZ@ethde.jnj.com>; Savidge, Sandy [ETHUS] <SSavidge@ETHUS.JNJ.com>; Scott, Robert A. [ETHUS] <RScott25@ETHUS.JNJ.com>; Slater, Andrea [ETHUS] <ASlater@ETHUS.JNJ.com>; Stoloff, David [ETHUS] <DStoloff@ETHUS.JNJ.com>; Storch, Mark L. [ETHUS] <MStorch@ETHUS.JNJ.com>; Tonkin, Warren [JNJCH] <wtonkin@jppch.jnj.com>; Willemin, Michel [JNJCH] <mwillemi@jppch.JNJ.com>; Wittorf, Anne-Martina [ETHDE] <AWITTORF@ethde.jnj.com>; Zhou, Jack [ETHUS] <JZhou@ETHUS.JNJ.com>

**Subject:** TVT SECUR Minutes - Team Meeting May 31st 2005 _ Agenda June 7th 2005

---

TVT SECUR Minutes - May 31st 2005
(Those in the TO list were in attendance)


General:

**HIGHLY CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**              **ETH.MESH.00199092**

Minutes from meeting May 24th were discussed; no issues were raised

Graphics / IFU
Final IFU changes will be done by Paul and send out for approval by Donna/Paul before June 9th.
Feasibility study from Germany about printing the label and sticking it on the foil has shown that
A 2mm safety border from label edge to printing area is necessary
Sticking the adhesive label on the sealing area rises the risk to stick over the blanking area
Final Label dimensions: 69*90mm
Final dimensions for Label printing area: 65*86mm (surrounding border of 2mm)
Barcode will stick on the bottom of the h-box (agreed!)
Anti-counterfeit label has to go on the box
Logo could hide some text, if text is repeated on other place on the box
Logo can stick on the box with ratio of 25% on the front side and 75% on the top side
Part number has to be printed on the carton but not on the label

CPC:
Biocompatibility sample (Build):
150 Implants
Sent from Switzerland to Germany in a pouch (50 per pouch)
Sterilized in the foil package which will be used for TVT S (One per foil)
Following sterilization all foils will be forwarded to Jörg for Biocompatibility test
20 Finger pads
Sent from Switzerland to Germany (all in one pouch)
Sterilized in the foil package which will be used for TVT S (One per foil without implant)
Following sterilization all foils will be forwarded to Jörg for Biocompatibility test
23 Implants and 46 Finger pads for analytical chemistry (EO Residuals)
Implants sent from Switzerland to Germany in a pouch (all in one pouch)
Finger pads will be sent from Switzerland to Germany (all in one pouch)
One Implant and Two Finger pads will be sterilized together in one foil
Following sterilization all foils will be sent to Jim Mc Divitt (Ethicon Somerville) for EO Residual test
Best case is, this test has been done before Jörg's tests but it is not a must (low risk), therefore all test start at the same time.
During sterilization validation the EO Residual test will be repeated with complete products (inclusive complete packaging) and compared to preliminary test. If difference is too large and EO residues in final product >250ppm tests have to be redone. Risk for this is estimated low.

Marketing / Clinical
Clinical and Marketing (Naomi, Allison and Kendra) will define/align until end of next week the training needs for:
Design validation
Investigation post PRA
User

Build protocol:
Comment necessary that all required samples (amount) are approximate numbers and might change
Manufacturing of samples for biocompatibility tests has to start as soon as the build protocol has been signed.
Since CPC decreased their requirements Neuchatel needs to speed up the time line.
Manufacturing in Switzerland is pending because some equipment (moisture meter) has not been qualified yet and some equipment is busy for other needs (nitrogen chamber; laser cutter)
Schedule for manufacturing of samples for Build Biocompatibility will be sent to Jörg, Dan and Raimo until end of Friday - Jeff, Gilles

**HIGHLY CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                                        **ETH.MESH.00199093**

Topics form German upfront meeting:
Approximately 60 sandwiches has been manufactured, but the build protocol has not been approved yet.
Since Martin did train all workers on existing specifications, we (Martin) needs to document with sign of workers, that they were trained, when they were trained and to what procedure they were trained.
In the rationale for the Build protocol we (Jeff) need to indicate the earlier production
49 Sandwiches meet dimension request (40mm +1mm) for bare mesh but bare mesh of 11 sandwiches is just approx. 39.5mm
We agreed in the team meeting that those sandwiches have to be used for Sterilization validation, so they need to be labeled clearly.
A later meeting with Paramount (vendor for assembling tool) clarified, that the requirement of 40mm+1mm is obsolete (change of tool design). This means, that no additional tracking of those sandwiches is necessary but for quality reasons still suggested (Alignment of upper and lower Ethisorb piece is nice to have for visual satisfaction of customers and so still a need)
Semi finished goods (Sandwiches) have a shelf life too, but what is the shelf of the sandwich (in the can)?
During CPC meeting (later this week) we agreed that Martin is responsible for a rationale extrapolating shelf life for semi-finished ETHISORB durapatch to semi-finished TVT S.
No further tests are necessary and the shelf life for semi finished goods is not a part of the stability study for the product.


TVT SECUR Team meeting Agenda- June 7th 2005 (Every Tuesday from 8:30 to 11...if needed)

Audio Conference ------------------------------
Toll Free Dial In Number: (877)468-2139
Int'l Access/Caller Paid Dial In Number: (918)583-3445
PARTICIPANT CODE: 445567 (All others callers)
HOST CODE: 840115 (designated meeting leader ONLY)
----------------------------------------------------------------


Graphics/Label update - Donna

IFU - Donna

Update clinicals / Training needs - Naomi

JEB Update - Raimo

CPC - Update (Sample requirements for CPC tests) / status of sheep study - Jörg/David

Topics from German upfront meeting - Martin

Topics from Swiss upfront meeting - Gilles

Open topics


Raimo Sump
Engineer

**HIGHLY CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                    ETH.MESH.00199094

Procedural Implants R&D
Ethicon Inc.

P.O. Box 151, Route 22 West
Somerville, NJ 08876-0151

Phone: +1 908 218 2814
Fax: +1 908 218 5424
E-mail: rsump1@ethus.jnj.com

**HIGHLY CONFIDENTIAL**
**SUBJECT TO STIPULATION AND ORDER OF CONFIDENTIALITY**                    **ETH.MESH.00199095**

# Exhibit E

COLLINS - FINLEY

**From:** Luscombe, Brian [ETHUS] <BLuscomb@ITS.JNJ.com>

**Sent:** Fri, 06 Apr 2012 14:52:05 GMT

**To:** Chahal, Ricky [ETHUS] <rchahal@ITS.JNJ.com>; Garbarino, Stefanie [ETHUS] <sgarbari@ITS.JNJ.com>; Stewart, Edward [ETHUS] <EStewar9@its.jnj.com>; Affeld, Tom [ETHUS] <TAffeld1@its.jnj.com>; Bouterie, Benjamin [ETHUS] <BBouteri@its.jnj.com>; Boldish, Walter [ETHUS] <WBoldish@its.jnj.com>; Tan, Daryl [ETHUS] <DTAN2@ITS.JNJ.com>; Courts, Paul [ETHUS] <PCourts@its.jnj.com>; Frost, Kevin [ETHUS] <KFrost88@ITS.JNJ.com>; Kajy, Mark [ETHUS] <Mkajy@its.jnj.com>; Lynch, Edward [ETHUS] <ELynch3@its.jnj.com>; Jones, Scott [ETHUS] <SJones34@its.jnj.com>; Jackson, David [ETHUS] <DJacks18@its.jnj.com>; Sovereign, John [ETHUS] <jsoverei@ITS.JNJ.com>; Clements, Charles [ETHUS] <CClemen4@its.jnj.com>; Mohler, Troy J. [ETHUS] <TMohler@its.jnj.com>; Syndram, Curtis [ETHUS] <csyndram@ITS.JNJ.com>; Toth, Janet [ETHUS] <JToth2@its.jnj.com>; Rose, Garrin [ETHUS] <grose1@ITS.JNJ.com>; Calabrese, Frank [ETHUS] <FCalabre@its.jnj.com>; Durand, Rosemarie [ETHUS] <RDurand2@its.jnj.com>

**CC:** Horton, Ronald [ETHUS] <RHorton9@its.jnj.com>; McCabe, Barbara [OCDUS Non J&J] <BMccabe@its.jnj.com>; DL-ETHUSSO EWHU DMs <DL-ETHUSSOSLSSPECIALTYDMs@ETHUS.JNJ.com>; Jones, Scott [ETHUS] <SJones34@its.jnj.com>; Salyer, Jon [ETHUS] <jsalyer@its.jnj.com>; Crawford, Tiffany [ETHUS] <TCrawfo1@its.jnj.com>

**Subject:** POP/INC BRAND TEAM CALL - Minutes from 4/5/2012

---

INCONTINENCE & PELVIC ORGAN PROLAPSE BRAND TEAM,

Thank you to those of you who were able to make yesterday's call, including: Troy Mohler, Ed Stewart, Garrin Rose, JD Sovereign, Stephanie Garbarino, and the marketing team. I realize that there was a last minute change to when this call was being held and that people had trouble with the dial-in number...

For those of you who were not able to make the call we covered three topics:

1) EARL-
    a) Likes – The team is generally happy with the content that is available on EARL and are finding it useful in their selling efforts
    b) Improvements - The team had a few recommendations for improvements to the content including:
        i) Update all Price Quotes (currently on the Portal) to 2012 pricing and make available on EARL
        ii)Enable the animated TVT procedure videos to be emailable to customers (last 3 video assets under TVT ABBREVO)
        iii) Add an emailable letter to the POP brands that provides customers with an update on the FDA and regulatory issues (currently only available as an Internal FAQ)
        iv) Add all Patient marketing materials to EARL (vs having on portal)

2) Sales and Marketing Portal
    a) The team felt that the Portal was out of date and only used it 1 time / month on average
        i) e.g. Price Quotes currently on the portal are for 2011 in some cases...
    b) The Portal is currently being redesigned to focus primarily on INTERNAL Only materials while EARL will be our primary venue for materials that are customer facing.
    c) It was noted that any presentation or document on the Portal can be uploaded to EARL by first saving it as a PDF, then emailing it to yourself, then opening on your iPad and storing it     under iBOOKS, however it

ETH.MESH.03959467

would be nice if we could simplify this and just make certain documents (like Price Quotes) available on the Ipad.

   c) Now that reps have EARL, they often will call on customers without their laptops so having everything they need on the ipad makes them more efficient

3) Y-mesh Launch

   a) We are getting close to being able to share specific launch information with the organization!

   b) In the meantime, we discussed some recommended actions that ALL reps can do NOW, in order to prepare for and maximize the launch:

> i)   We discussed how familiar most reps are with the sacrocolpopexy procedure.  Most people thought that reps could benefit now by being in a few cases and asking questions and really understanding the procedures.   Given that GYNECARE TVT and GYNECARE MORCELLEX are sometimes used in the same patients (concomitantly) as a Y-mesh this is something every rep can do now without detracting from the focus.

> ii) Although not discussed on the call, here is some additional information that comes from one of the reps on our Y-mesh launch team:

>> Recommendation is to talk with the GYN/URO who sits on the Value Analysis Committees in your Key Accounts.  Make sure you understand the procedure for introducing new products in these facilities.  Understand and get copies of the forms are required to be completed, so that when you speak to your competitive y-mesh surgeons for the first time you have the new product request form in hand.  Sometimes the surgeons will be willing to sign and fill out the forms right on the spot.  **The rep will not speak about the Y mesh at all at this time**.  They just need to understand the process and get the appropriate forms.  The process should be the same for any product.

*Brian Luscombe*
US Product Director, Pelvic Reconstructive Surgery


http://teamsna.jnj.com/eth/projecttomorrow/Shared%

P.O. Box 151
Somerville, NJ 08876
908-218-2141 (office)
908-625-6463 (mobile)
908-218-2886 (fax)

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | |
|---|---|
| IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | Master File No. 2:12-MD-02327 MDL No. 2327 |
| THIS DOCUMENT RELATES TO ALL | JOSEPH R. GOODWIN U.S. DISTRICT JUDGE CASES |

## DECLARATION OF LISA KAISER

Lisa Kaiser declares and says:

### Background

1.      My name is Lisa Kaiser. I am over twenty-one years of age and of sound mind. I am competent to affirm all of the matters set out in this Declaration.

2.      I am currently employed as Director, Worldwide Quality Systems at Ethicon Inc. ("Ethicon"), a position I have held for the past two years. Previously, from 2002 through 2006, I held other positions in Quality Systems and Supplier Quality at Ethicon. From 2006 through the end of 2009, I worked at Ortho Clinical Diagnostics (another Johnson & Johnson company) in quality affairs and quality systems positions. Between 2010 and 2011, I was employed by International Technidyne Corporation as a senior director of quality systems and compliance.

### Ethicon's Records Management Policies, Procedures and Training

3.      In my current position in Ethicon's Quality Systems group, I have oversight and accountability for Ethicon's records management policies, procedures and practices.

4.      Ethicon operates in the highly regulated field of medical device manufacturing. United States Food & Drug Administration (FDA) regulations require Ethicon to manage and

maintain certain quality records related to Ethicon's business, which is among the reasons records management is within my area of responsibility. (Various standards published by the International Standards Organization (ISO) also cover quality records requirements.)

5.      To comply with regulatory requirements or adhere to accepted standards, Ethicon has established policies, procedures and training programs regarding records retention in the ordinary course of its business.

6.      Ethicon has a written records management policy — Ethicon's Franchise Policy for Records Management (PL 553-005), which is attached. As stated in the policy, its purpose is to enable Ethicon to "effectively create, use, value, manage, protect and dispose of its records and information in accordance with applicable laws and regulations, business considerations, and other Ethicon and Johnson & Johnson policies and standards, including those regarding legal holds.

7.      The policy also outlines its scope, providing that it applies to all associates (that is, employees, contractors, consultants and temporary staff) of Ethicon and records and information in any form or medium (e.g., paper, electronic, microfilm, microfiche, photograph, map, magnetic or optical disk or tape, software, video or other records information).

8.      In addition, the policy details the roles and responsibilities of the management with executive responsibility, the corporate records manager, site records manager(s), department head(s), the records coordinator, and Information Technology.

9.      To promote this policy, Ethicon has published various training documents and other written materials that further describe record retention procedures, and established programs to train its associates on these procedures.

10.     For example, Ethicon has published an extensive record retention schedule that provides associates with guidance as to the retention of various categories and specific types of records and information, regardless of form (e.g., paper, electronic, etc.). This schedule provides that many types of records related to its products (including but not limited to pelvic mesh products) must be maintained for at least the "life of production" or the "life of the organization" (Ethicon). Examples of records that must be retained for at least the life of the product or organization include, among others, design history files (DHFs), laboratory notebooks, technical reports, labeling content, and FDA submissions.

11.     Ethicon has in place training programs and protocols to educate its associates as to record retention. New associates at Ethicon receive Records and Information Management (RIM) training.

12.     Ethicon's training is interactive, requiring associates to "check their understanding" of issues as they move through the program.

13.     In its substance, this training provides an overview of the records and information management program, including its benefits and the risks of non-compliance. It provides detailed information regarding other issues such as (i) the lifecycle of records and information; (ii) the distinction between a record and convenience information; (iii) roles and responsibilities with respect to records and information management; (iv) managing electronic records in particular; and (v) legal holds.

14.     As to the last component, the training explains what a document preservation or legal hold notice is and how to read it. It then tests the associate's understanding of compliance through an exercise. Finally, the training includes a summary discussion of the legal hold requirements.

15.     Ethicon associates are required to complete this training, including the portion on legal holds, on an annual basis. Associates receive reminder emails if they have not completed the training. Further, executive management receive emails regarding overdue training of any associates that fall under their supervision.

<u>How Documents Are Maintained at Ethicon</u>

16.     Due to the regulations under which Ethicon operates as well as technology employed by Ethicon, an increasing number of records are created and managed in central or shared locations, such as SharePoints, group shares, and databases.

17.     Indeed, most "files of record" (many of which are required to be maintained and preserved by Ethicon under the Quality Systems Regulations, 21 CFR part 820) are maintained in group or central sources, rather than in any one individual's custody. For example, the Design History File, or DHF, which defines the design and development of a given product, is a collection of materials that Ethicon maintains centrally. Likewise, Ethicon's Regulatory Affairs group maintains in central files applications for regulatory clearance for Ethicon's products (including pelvic mesh products), which include applications, supporting materials, follow-up communications between Ethicon and FDA, and documentation regarding FDA's clearance determination. In addition, reports of complaints or adverse events associated with Ethicon's products are maintained by Ethicon on an electronic database, rather than by any one individual.

18.     I represent that the foregoing statements are true under the penalties of perjury.

Dated: January 9, 2014

Lisa Kaiser

4

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | |
|---|---|
| IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br><br>───────────────────────────<br><br>THIS DOCUMENT RELATES TO ALL CASES | **Master File No. 2:12-MD-02327**<br>**MDL No. 2327**<br><br><br>**JOSEPH R. GOODWIN**<br>**U.S. DISTRICT JUDGE** |

**DECLARATION OF PHU DAO**

Phu Dao declares and says:

1.     My name is Phu Dao.  I am over twenty-one years of age and of sound mind.  I am competent to affirm all of the matters set out in this Declaration.

2.     I have been employed by Johnson & Johnson Shared Services, Inc. ("ITSS"), since 2006.  I am currently Director, End User Services for North America and Latin America. Between approximately 2008 and 2010, I provided support to Ethicon at its Somerville, New Jersey location.  During that period, ITSS had a contract with International Business Machines ("IBM") under which IBM provided end-user company issued desktop and laptop computer ("PC Device") support to all levels of Ethicon employees including upper management, contractors, consultants, and temporary staff (collectively referred to below as "Associates").

3.     As described further below, the IBM contractors acted as representatives of ITSS. I had overall responsibility for oversight of the IBM contract which outlined the responsibilities of these ITSS representatives.

4.     I am submitting this declaration to describe the roles and responsibilities of ITSS representatives and to clarify that I am unaware of circumstances in which data known to be

relevant to pelvic mesh litigation was intentionally deleted or destroyed.  I also submit this declaration to explain one of several steps that have been taken since mid-2012 to minimize the risk of loss of data in the future.

5.    ITSS representatives have and have had responsibility for retrieving an Associate's PC Device upon his or her departure.

6.    During the period prior to mid-2012, upon retrieving the departed Associate's hardware, ITSS representatives retained the hard drive for 14 days.  If within that 14-day period, ITSS received a request to facilitate a manager's access to or preservation of the departed Associate's data, ITSS accommodated the request by providing the departed Associate's manager with access to the data.  Only after any such requests to facilitate access to or preservation of the departed Associate's data were satisfied, or, if no requests were submitted, at the end of the 14-day period, the PC Device would either be (a) recycled, if it was at the end of its lifecycle, or (b) re-imaged and re-deployed in the ordinary course of business.

7.     I am not aware of anyone employed by ITSS or IBM having intentionally deleted or destroyed any data that was known at that time to be relevant to the Ethicon pelvic mesh litigation.

8.    Indeed, in June 2012, in order to minimize the risk of loss of departing Associates' data, I understand that Ethicon's Somerville, New Jersey site adopted the practice of indefinitely preserving the data from departing Associates' PC Device(s), which remains Ethicon's practice today and now includes all Ethicon locations within the United States.

I represent that the foregoing statements are true under penalties of perjury.

Phu Dao

Dated: January 8, 2014

# EXHIBIT 10

Patricia Mesigian, et al. v. Ethicon, Inc., et al.
February Term, 2014 No. 00399

Monday, April 8, 2019
Jury - Afternoon Session

Page 109

1      IN THE COURT OF COMMON PLEAS
       FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
2              CIVIL TRIAL DIVISION
3                    - - -
4   PATRICIA MESIGIAN and          :      FEBRUARY TERM, 2014
    GEORGE MESIGIAN, w/h,          :
5            Plaintiffs,           :   :
6        vs.                       :      NO. 00399
7   ETHICON WOMEN'S HEALTH AND :   :
8   UROLOGY, A DIVISION OF         :
    ETHICON, INC., et al.,         :
9   Defendants.                    :
10                   - - -
11         Courtroom 246 and 285
                   City Hall
12       Philadelphia, Pennsylvania
13                   - - -
14          Monday, April 8, 2019
15                   - - -
16      JURY VOIR DIRE and MOTIONS
17          AFTERNOON SESSION
18                   - - -
19
20   BEFORE: THE HONORABLE DANIEL J. ANDERS, J.
21
22                   - - -
23          Adrian Dale Baule, RMR, CRR, CSR
                Official Court Reporter
24
25

Page 110

1   APPEARANCES:
2   KLINE & SPECTER, PC
    BY: THOMAS R. KLINE, ESQ.
3        MICHAEL A. TRUNK, ESQ.
         CHRISTINE V. CLARKE, ESQ.
4        PHILIP M. PASQUARELLO, ESQ.
         CHARLES BECKER, ESQ.
5        KILA B. BALDWIN, ESQ.
    1525 Locust Street, 19th Floor
6   Philadelphia, PA 19102
    (215)772-1000
7
8       Attorneys for the Plaintiffs
8   BECK REDDEN LLP
9   BY: KATHLEEN GALLAGHER, ESQ. (pro hac vice)
    1221 McKinney Street, Suite 4500
10  Houston, TX 77010
11  (731)951-6208
    BARTLIT BECK LLP
12  BY: REBECCA WEINSTEIN BACON, ESQ. (pro hac vice)
    Courthouse Place
13  54 West Hubbard Street
    Chicago, IL 60654
14  (312)494-5548
15  MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
    BY: JOHN J. HARE, ESQ.
16  2000 Market Street, 23rd Floor
    Philadelphia, PA 19103
17  (215)575-2600
18  TUCKER ELLIS LLP
    BY: JULIE A. CALLSEN, ESQ.
19  950 Main Avenue, Suite 1100
    Cleveland, OH 44113
20  (216)696-2286
21  DRINKER BIDDLE & REATH LLP
    BY: D. ALICIA HICKOK, ESQ.
22  One Logan Square, Suite 2000
    Philadelphia, PA 19103-6996
23  (215)988-2700
24
25

Page 111

1   APPEARANCES (Continued):
2   BUTLER SNOW LLP
    BY: ADAM PORTER, ESQ. (pro hac vice)
3   1020 Highland Colony Parkway, Suite 1400
    Ridgeland, MS 39157
4   (601)985-4468
5       Attorneys for Defendants Ethicon, Inc. and
            Johnson & Johnson
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 112

1            (Whereupon, the following proceedings were
2    held in the robing room of Courtroom 246.)
3            MR. KLINE:   So how are we going to
4    identify them?
5            THE LAW CLERK:  So we can do, like, number
6    and then put the panel in parens, maybe, like first,
7    second, or third.
8            MS. GALLAGHER:  So what are we doing now?
9            MR. KLINE:   I need to do some work on
10   that -- let's put the name so there's no doubt -- there's
11   no doubt that we --
12           MS. GALLAGHER:  Who we're striking.
13           MR. KLINE:   And then let's put -- let's do
14   it uniformly. Let's -- I propose that we do the name and
15   then -- and then Panel 1 -- why don't we do -- we don't
16   have to write that out. P1, Juror 1 or Juror 12 to pick
17   it so that we know it's from the -- we know what panel
18   it's from, because there are a bunch of Juror 1s, Juror
19   1s, Juror 1s.
20           MS. GALLAGHER:  Okay. I'm confused.
21   So --
22           MR. KLINE:   This is --
23           THE LAW CLERK:  Make your strike on that.
24   We'll do Plaintiff and Defendant.
25           MS. GALLAGHER:  Oh, I see. I didn't see

Patricia Mesigian, et al. v. Ethicon, Inc., et al.
February Term, 2014 No. 00399

Monday, April 8, 2019
Jury - Afternoon Session

Page 141

1  Scotland, the government released an actual independent
2  report titled, "The Independent Review of the Use,
3  Safety, and Efficacy of Transvaginal Mesh Implants."
4  These are independent reports. That's their analysis.
5           It's just like if I wanted to call any
6  given author of any literature, Joye Lowman, for
7  instance, who authored simple studies about the Prolift.
8  She is one of their experts. We're going to come in and
9  cross-examine her about how she got her data, what she
10 did. It's the same thing.
11          THE COURT:   Here's what I'll tell you, is
12 that it was notable looking at your briefing on the FDA
13 to note that the phrase "generally recognized as safe and
14 effective" has a different meaning under the Food, Drug,
15 and Cosmetic Act, that safe and effective under the FDA.
16          And so what I want to avoid is any jury
17 confusion and/or trial over what does safe and effective
18 mean in the UK versus Scotland versus New Zealand. And
19 so I'm going to limit it just to studies that focus on
20 U.S.-based products or U.S.-based --
21          So if you have things that you want to
22 introduce, I'll look at them, and I'll keep an open mind.
23 But your responsive briefing didn't put forth, least than
24 from what I'm now looking back at, any studies other than
25 those relied upon by the four countries that were

Page 142

1  mentioned, the UK and Scotland and Australia and New
2  Zealand.
3          MR. KLINE:   May I?
4          THE COURT:   Sure.
5          MR. KLINE:   But Your Honor, I think that
6  you may want to hear the case as it develops. I heard
7  you say you'll keep an open mind. I think on both sides
8  you're going to hear a variety of evidence.
9          This product was -- was actually invented
10 in France. There are original studies by the -- by the
11 inventors in France. It is -- was studied in a variety
12 of places. And my experience in these trials is that
13 both parties rely upon medical literature that crosses
14 all kinds of borders, national borders.
15          THE COURT:   Yeah. We just had that with
16 Mr. Pasquarello. There was some information in 2004
17 and 2006 about studies in France. All that's going to
18 come in. So I'm not saying those types of evidence
19 doesn't come in. But regulatory actions, regulatory
20 findings, regulatory studies by the regulatory agencies
21 would not.
22          MR. KLINE:   I wasn't sure what the Court
23 was saying, so I was concerned.
24          THE COURT:   Okay.
25          The next motion is motion in limine --

Page 143

1  Defense motion in limine No. 5 to exclude evidence of
2  Plaintiffs' allegations of spoliation. Defendants argue
3  that evidence of destruction of documents and e-mails is
4  irrelevant, it's unfairly prejudicial, and it relates to
5  a discovery dispute that should not be litigated before
6  the jury.
7          The Plaintiffs respond that Defendants'
8  destruction of files of officers in highly ranked
9  employees of Ethicon including Ethicon's worldwide
10 president, medical affairs director, chief medical
11 officer, worldwide marketing director, and clinical
12 affairs manager was widespread, systemic, and in
13 violation of preservation notices, litigation holds, and
14 Defendants's internal document retention policies.
15          Plaintiff cites to Hammons v. Ethicon, 190
16 A.3d 1248, The Superior Court 2018, as binding precedent
17 and further urges this Court to deny Defendants' motion,
18 because Plaintiff has the burden of proof and that a jury
19 may hold the absence of those documents against Plaintiff
20 against unless Plaintiff is permitted to explain what
21 they're missing.
22          The trial court will grant's Defendants'
23 motion. The Superior Court's decision in Hammons in
24 instructive in finding that no spoliation charge was
25 warranted, which is consistent with several other trial

Page 144

1  courts that refused to issue a spoliation charge.
2  Hammons is also instructive in finding that destruction
3  of documents is relevant evidence, because Plaintiff has
4  the burden of proof, and the absence of large documents
5  from higher-ranking officials could be used against
6  Plaintiff by the jury unless Plaintiff demonstrates why
7  those documents are missing.
8          However, in weighing the probative value
9  of such evidence against the danger of unfair prejudice,
10 juror confusion, and undue delay, I'm finding that such
11 dangers outweigh the minimal relevance of such evidence.
12 I recognize that this is a departure from the Superior
13 Court's holding in Hammons, but I've engaged my own
14 separate and independent discretionary weighing under
15 Rule 403.
16          MR. KLINE:   Yes. Your Honor, subject to
17 the -- subject to something happening at the trial which
18 might change our opinion, we have nothing further to
19 argue.
20          THE COURT:   Very good.
21          The next motion is Plaintiffs' motion
22 No. 1 to preclude evidence that Prolift is a standard of
23 care for the treatment of pelvic organ prolapse.
24          Plaintiff argues that whether a physician
25 complied with the standard of care when selecting Prolift

# EXHIBIT 11

```
1                      REPORTER'S RECORD
                      VOLUME 1 OF 1 VOLUMES
2                TRIAL COURT CAUSE NO. DC-12-14350

3    LINDA BATISTE              )   IN THE DISTRICT COURT
                                )
4                               )
     vs.                        )   DALLAS COUNTY, TEXAS
5                               )
     JOHN ROBERT MCNABB, M.D.,  )
6    JOHNSON & JOHNSON, AND     )
     ETHICON, INC.              )   95TH JUDICIAL DISTRICT

7

8

9

10

11    _____

12                        PRETRIAL

13    _____

14

15

16

17

18

19

20           On the 12th day of March, 2014, the following

21    proceedings came on to be held in the above-titled and

22    numbered cause before the Honorable, Judge Ken Molberg

23    Presiding, held in Dallas, Dallas County, Texas.

24           Proceedings reported by computerized

25    stenotype machine.
```

1    enough for spoliation. That's not the term the Court

2    used, but anyway, you get the picture.

3             Here -- here is my ruling. I am actually

4    going to grant the defendants' limine on spoliation

5    because there is a situation where it would be highly

6    relevant to -- for a witness to explain why something

7    wasn't -- more particularly because they didn't have the

8    documents because they were destroyed. So I want to know

9    if it's going to arise in that context. I do not intend

10   to permit a mini trial about whether or not the

11   defendant spoliated documents without more at this

12   point. So before we go into anything more about loss,

13   missing or destroyed evidence, you're going to have to

14   talk to me about it in the context of this trial.

15            Now, I'm going to carry your motion for

16   sanctions other than the adverse inference, and I won't

17   decide the adverse inference until I see how this plays

18   out in trial. If I have a witness, for example -- and

19   this comes up all the time -- well, Doctor, why can't

20   you say what this was about? Well, it's because so-and-

21   so threw the records away. That's one thing.

22            If we're talking about a different

23   subject matter and it just so happens that same

24   defendant destroyed a lot of documents that don't have

25   any bearing on this, then I'm not going to let it in, if

# EXHIBIT 12

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

| | |
|---|---|
| IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br><br>_____<br><br>THIS DOCUMENT RELATES TO ALL CASES | **Master File No. 2:12-MD-02327<br>MDL No. 2327**<br><br><br>**JOSEPH R. GOODWIN<br>U.S. DISTRICT JUDGE** |

## <u>DECLARATION OF PAMELA DOWNS</u>

Pamela Downs declares and says:

1.      My name is Pamela Downs. I am over twenty-one years of age and of sound mind. I am competent to affirm all of the matters set out in this Declaration.

2.      I am employed as a Senior Director at Epiq Systems, Inc., eDiscovery and Litigation Solutions. During my 26 year career supporting the legal services industry, I have developed extensive experience in the assessment, collection and production of hard copy and electronically stored information in litigated matters.

0.      In 2013, on behalf of Ethicon, Inc. ("Ethicon"), I was retained to examine the nature and scope of documents outside of the United States ("ex-US documents") maintained by Ethicon, including documents provided to Ethicon by MedScand Medical ("MedScand"), the original manufacturer of TVT based in Sweden.

1.      In connection with my examination of MedScand related issues, I have interviewed over 25 Ethicon employees and reviewed numerous documents.

5.      It is my understanding that in November of 1999, Ethicon purchased from MedScand the rights to manufacture and sell TVT. It is my understanding that in 2005, CooperSurgical purchased MedScand and sought to determine the disposition of a pallet of 12 cases, weighing approximately 600 pounds, which were believed to contain TVT-related MedScand materials.

6.      It is my understanding that in November 2005, CooperSurgical sent the pallet of 12 cases to the Johnson & Johnson International Shared Services Distribution Center Site in Sweden.

7.      In 2006, seven of these cases -- which contained product retains -- were disposed of as they no longer served any business purpose.

8.      As to the MedScand manufactured product retains, I have confirmed that the shelf life for the original TVT product was five years. In 2000, Ethicon began manufacturing TVT and maintaining its own product retains. Therefore, by 2006, any MedScand manufactured product retains from prior to 2000 would have been past the product's shelf life.

9.      Colin Yuill, the current Quality Manager in Neuchatel, confirmed that a product retain past its shelf life would not have been retained as it no longer served a business function.

10.     Four of the 12 cases contained lot documentation from the period during which MedScand manufactured TVT. While the continuing business purpose of these materials to Ethicon in 2005 or 2006 is unclear, it appears that Ethicon decided that this lot documentation should be sent to Ethicon SARL in Neuchatel, Switzerland. I have been unable to determine whether these records were actually sent; however, I understand that Ethicon has been unable to locate these records.

11.     It is my understanding that in February 2006, the 12th case, which contained boxes that included documents regarding clinical studies, was shipped from the Johnson & Johnson International Shared Services Distribution Center Site in Sweden to Ethicon SARL in Neuchatel, Switzerland and stored at an offsite facility maintained by Secur'Archiv, a third party vendor.

12.     On or around September 24, 2009, a fire occurred inside the Secur'Archiv offsite facility destroying thousands of boxes including all but one of the boxes from the 12th case. This box, along with other surviving boxes, were reassigned to other offsite storage facilities in Switzerland. It is my understanding that this box contained only a single binder of patient data from the Scandinavian Multicenter Study, which Ethicon has produced to Plaintiffs in this litigation.

13.     It is also my understanding that Ethicon has produced documents related to Ulmsten's clinical studies aside from the binder including Ulmsten's published articles and the October 17, 1997 report of Margareta Eriksson on the Scandinavian Multicenter Study.

14.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this the 9th day of January, 2014.

_Pamela Downs_
_____
PAMELA DOWNS