IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CAROLYN M. KIEFFABER  and | ) | |
| THOMAS M. KIEFFABER, | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 6:20-CV-01177-KHV |
| | ) | |
| v. | ) | |
| | ) | |
| ETHICON, INC. and | ) | |
| JOHNSON & JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR RECONSIDERATION OF THE VIRTUAL TRIAL**

Unprecedented progress toward widespread vaccination has undermined the necessity for a virtual trial.  With the rapid approach of the finish line of the COVID-19 pandemic, a traditional trial will be possible in a few short months.  Defendants Ethicon, Inc. and Johnson & Johnson (collectively, "Ethicon") respectfully ask the Court to reconsider its Order Directing Jury Trial by Videoconference (Doc. 185).  Furthermore, certain procedures in the Court's Order Regarding Trial Proceedings (Doc. 200) also demonstrate why Ethicon seeks reconsideration.

On February 8, 2021, the Court scheduled this trial by videoconference to begin on April 19, 2021.  Since that date, improved vaccination programs have dramatically reshaped the landscape of the pandemic in the United States.  In the interest of justice, the Court should reconsider holding a virtual trial, which will inject significant prejudice and unnecessary logistical challenges and costs.

The Court's March 3, 2021 Order Regarding Trial Proceedings (Doc. 200) provides concrete examples of prejudice to zealous representation of the parties' interest that are inherent with a virtual trail.  Requirements in that Order shackle the lawyers' ability to effectively employ the tools of their trade.  The Order's dictates will inhibit the lawyers from establishing rapport with

in-person witnesses and force the lawyers and their witnesses to engage in both direct examination and cross-examination from different rooms.  The Order severely limits the lawyers' impeachment of witnesses on cross-examination by essentially demanding a scripted cross before counsel hears the direct examination.  This Order also reformats contemporaneous evidentiary objections from verbal interjections to silently raised hands.  These objections will be less effective and could be easily overlooked .  The court reporter's failure to record an objection could further risk waiver of appellate consideration of an objection properly raised at trial.

All of these measures, while intended to respond to grave difficulties imposed by the virtual trial format, diminish the lawyers' ability to make strategic decisions, prejudicing our client.  None of these impositions contributes significantly to the safety of the Court, parties, witnesses, and lawyers.  For all of these reasons, the Court should delay this trial briefly rather than hold a virtual trial.

## STANDARD FOR RECONSIDERATION

Federal Rule of Civil Procedure 54(b) allows for reconsideration of an interlocutory Order: "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . **may be revised at any time** before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  (emphasis added).  This reconsideration is permissible because, "In considering such interlocutory motions, however, 'the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rule of Civil Procedure 59(e) and 60(b),' which govern a district court's reconsideration of its final judgments." *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018), *as revised* (Apr. 13, 2018) (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008)).

And, as is true in this case, "Of course, a district court always has the inherent power to reconsider its interlocutory rulings." *Warren v. Am. Bankers Ins. of FL*, 507 F.3d 1239, 1243 (10th Cir. 2007). Reconsideration is appropriate here to prevent the prejudice associated with a virtual trial held in the final days of the COVID-19 pandemic's emergency-imposed vigilance with respect to in-person gatherings.

## ARGUMENT

### I. The End Of The Emergency Phase Of The Pandemic Is In Sight Making A Virtual Trial Unnecessary.

When the Court ordered this virtual trial, uncertainty reigned. This last month has sharpened a picture, which was only beginning to come into focus in early February.

Current statistics for the "biggest vaccination campaign in history" far exceed the vaccine counts at the time the Court decided to hold a virtual trial.[1] More than 312 million doses have been administered in 118 countries, and 92.1 million doses have been given in the United States since the start date of December 14, 2020.[2]

Johnson & Johnson's vaccine—the first single-shot vaccine—received Emergency Use Authorization on February 27, 2021, becoming the third vaccine approved by the FDA for emergency use.[3] In light of the availability of the Johnson & Johnson vaccine, President Biden

---

[1] *More Than 312 Million Shots Given: Covid-19 Tracker*, Bloomberg (updated Mar. 9, 2021), https://www.bloomberg.com/graphics/covid-vaccine-tracker-global-distribution/. For comparison, the January 24, 2021 version of this article, *More Than 65.6 Million Shots Given: Covid-19 Tracker*, stated that 65.6 million doses had been administered in 56 countries, with 22.4 million shots in the United States.

[2] *Id.*

[3] Noah Weiland & Sharon LaFraniere, *F.D.A. Clears Johnson & Johnson's Shot, the Third Vaccine for U.S.*, The New York Times, (updated Mar. 3, 2021), https://www.nytimes.com/2021/02/27/health/covid-vaccine-johnson-and-johnson.html ("Johnson & Johnson has pledged to provide the United States with 100 million doses by the end of June. When combined with the 600 million doses from the two-shot vaccines made by Pfizer-BioNTech and Moderna slated to arrive by the end of July, there will be more than enough shots to cover any American adult who wants one."). *See also Johnson & Johnson COVID-19 Vaccine Authorized by U.S. FDA for Emergency Use – First Single-Shot Vaccine in Fight Against Global Pandemic*, Feb. 27, 2021, https://www.jnj.com/johnson-johnson-covid-19-vaccine-authorized-by-u-s-fda-for-

announced that, through a deal between Johnson & Johnson and Merck & Co., there will be sufficient vaccines for every American adult *as soon as the end of May*.[4]

The positive downward trend in new COVID-19 cases beginning in January has continued. By early February the seven-day rolling average of new cases had descended from the January 8 peak of nearly 260,000 to 136,442, a 47% drop.[5]  Hospitalizations too have continued to drop through early March, and the March 7 average was, 41,675, around a third of early February's.[6] Last week was the seventh week in a row of significant falling hospitalizations.[7]

On the same day the Court decided to hold this trial virtually, Kansas local news reported that the state was ranked 49th of 50 in vaccination rates.[8]  At that time, only around 300,000 doses of the only two vaccine options (Pfizer-BioNTech and Moderna) available had been administered of the nearly 500,000 delivered to the state.[9]  Percentages of the population vaccinated in early February were that 8% had received their first shot and only 2.4% had received both shots.[10]  But, in Kansas's most recent Vaccine Update summary report of March 4, the state had doubled the

---

emergency-usefirst-single-shot-vaccine-in-fight-against-global-pandemic (noting that the FDA's "decision was based on the totality of scientific evidence, including data . . . that demonstrated the vaccine was 85 percent effective in preventing severe disease across all regions studied, and showed protection against COVID-19 related hospitalization and death, beginning 28 days after vaccination.").

[4] Sheryl Gay Stolberg, Sharon LaFraniere, Katie Thomas, & Michael D. Shear, *Biden Vows Enough Vaccine 'for Every Adult in America' by End of May*, The New York Times, Mar. 2, 2021, https://www.nytimes.com/2021/03/02/us/politics/merck-johnson-johnson-vaccine.html.

[5] Lazaro Gamio, *U.S. Coronavirus Cases Are Down but Eclipse Spring and Summer Peaks*, The New York Times, Feb. 5, 2021, https://www.nytimes.com/interactive/2021/02/05/us/covid-peak-comparison.html.

[6] CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (updated Mar. 8, 2021).

[7] *Id.*

[8] Jason Tidd, *Kansas COVID vaccination rates remain low, rank 49th of 50 states in CDC Report,* The Wichita Eagle, Feb. 8, 2021, https://www.kansas.com/news/coronavirus/article249095875.html.

[9] *Id.*

[10] *Id.*  Health officials cautioned there could be delays in reporting.  *Id.*

number of vaccinations distributed to over 600,000.[11]  The CDC's daily updated numbers report

over 740,000 doses administered.[12]  The percentage of the population vaccinated now stands at

over 17% having received one dose and 9% both doses, and Kansas's weekly change in doses

administered as of March 7, 2021, was up 31%.[13]  Kansas's Vaccination Phases plan predicts that

by June, the state will have moved into its final phase, Phase 5, which includes administration to

the entire adult population.[14]

Even considering new strains and other complicating factors, a 2021 update to global

management consulting advisor McKinsey & Company's outlook article on *when* the pandemic

will end maintains that, "Transition toward normalcy in the United States remains most likely in

the second quarter of 2021 and herd immunity in the third and fourth quarters."[15]  The same article

concludes that this transition will be marked by falling COVID-19 mortality and the "de-

---

[11] Kansas Department of Health and Environment, *COVID-19 Vaccine Updates*, Mar. 4, 2021, https://www.kansasvaccine.gov/DocumentCenter/View/123/Vaccine-Historical-Document-3421?bidId=.

[12] CDC COVID Data Tracker, *COVID-19 Vaccinations in the United States*, (updated Mar. 8, 2021), https://covid.cdc.gov/covid-data-tracker/#vaccinations.

[13] Dan Keating, *et al.*, *At least 60 Million People have received one or both doses of the Vaccine in the U.S.*, The Washington Post, (updated Mar. 9, 2021), https://www.washingtonpost.com/graphics/2020/health/covid-vaccine-states-distribution-doses/; *See How the Vaccine Rollout is Going in Your State*, The New York Times, (updated Mar. 8, 2021), https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html. Kansas's ranking has not improved. *See also* Katie Adams & Maia Anderson, *States Ranked By Percentage of COVID-19 Vaccines Administered: Mar. 9*, Becker's Hospital Review, (updated Mar. 9, 2021), https://www.beckershospitalreview.com/public-health/states-ranked-by-percentage-of-covid-19-vaccines-administered.html (ranking Kansas as 50th in percentage of COVID-19 vaccines administered).

[14] Kansas Department of Health and Environment, *Kansas Vaccination Phases / By Population*, https://www.kansasvaccine.gov/DocumentCenter/View/120/Vaccine-Phase-Chart-PDF-.

[15] Sarun Charumilind, Matt Craven, Jessica Lamb, Adam Sabow, & Matt Wilson, *When will the COVID-19 pandemic end?*, McKinsey & Company, (updated Jan. 20, 2021), https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/when-will-the-covid-19-pandemic-end#.

exceptionaliz[ing]" of the disease in that it "will become a more normal part of the baseline disease

burden in society" as opposed to "a special threat requiring exceptional societal response."[16]

There are indications that this target may not be out of reach, and many of these

developments have occurred more recently, certainly after February 8.  Just yesterday, the CDC

issued guidance, the "first set of public health recommendations for fully vaccinated people," and

the CDC recommended that fully vaccinated people can:

- Visit with other fully vaccinated people indoors without wearing masks or physical distancing

- Visit with unvaccinated people from a single household who are at low risk for severe COVID-19 disease indoors without wearing masks or physical distancing.

- Refrain from quarantine and testing following a known exposure if asymptomatic.[17]

## II.     The Limitations Imposed By The Order Regarding Trial Proceedings Demonstrate Why The Court Should Not Try This Case Virtually.

A virtual trial should conform as closely as possible to a traditional in-person trial.  The

Court must allow the lawyers to use their skills of rapport-building with witnesses on direct

examination, adaptability in impeachment on cross-examination, and verbal, interrupting

evidentiary objections to ensure that no impermissible evidence taints the trial presentation.  Safety

is not augmented by these restraints on these fundamental and crucial aspects of trial advocacy in

the Court's Order, and these impositions should yield to strategic determinations and skills

available to lawyers in all in-person jury trials.  Each of the requirements discussed herein, by

---

[16] *Id.*

[17] CDC, *Interim Public Health Recommendations for Fully Vaccinated People*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (updated Mar. 8, 2021).

dramatically altering the way in which the lawyers must try their cases, illustrates why the Court should delay this trial a few short months rather than try it virtually.

### A.    Rapport-building with witnesses on direct examination

The Court's Order, Section D, "Witnesses And Participants," ¶ 6 states, in part:  "Counsel and witness may not be in the same room or otherwise visible to one another except over the Zoom platform in court."  Doc. 200 at 7.

Ethicon will call certain witnesses live, and this requirement prevents Ethicon's prerogative from having the effect it would in a traditional trial.  The Court stated previously that it believes that "most of defendants' evidence will consist of video depositions from experts."  Doc. 185, at 6.  That assumption is not correct.  Ethicon has not taken videotaped de bene esse depositions of its experts because it has no intention of offering that evidence by deposition.  Each of Ethicon's experts will appear live at trial.  In a traditional trial, Ethicon selects which witnesses it will call live based on considerations about the effective presentation through a real-time conversation between these witnesses and its lawyers.  The separate room requirement will diminish the significance of this choice by reducing all testimony to a presentation similar to a video deposition.  The jury will lose the ability to observe the personal interaction between lawyers and witnesses which is vital to credibility assessments and not as accurately captured by responses to disembodied questions.  Ethicon will be prejudiced by this requirement after it has planned to call these witnesses live and prepared the presentation of its defenses accordingly.

There is no significant gain in safety by forcing a physical hermetic seal between the lawyers and these witnesses.  The witnesses Ethicon would call in person in this trial have already been vaccinated, and they are amenable to traveling to the trial location, whether traditional or

virtual.  If the Court is concerned about the possibility of inappropriate off-camera communication between lawyer and witness, there are less prejudicial means to accomplish this end.

>### B.        Adaptability in impeachment on cross-examination

Section E, "Exhibits," ¶ 7 states, in part:  "Counsel may use exhibits for impeachment purposes only through the following method:  Paper copies of exhibits intended solely for impeachment purposes shall be placed in a sealed envelope and delivered to the witness *before trial*."  Doc. 200 at 9 (emphasis added).

This requirement assumes that the lawyers can decide when, how, and with what documents they will impeach the opposing party's witnesses prior to hearing their direct testimony. Lawyers have some advance ideas about which documents they will use to impeach a witness. But, a skilled trial lawyer must be able to adapt to the changing circumstances of a witness's testimony.   Unexpected testimony requires lawyers to quickly react and use unanticipated documents to counter that testimony.  Cross-examination is by no means as scripted as direct examination.

Trial lawyers are not actors set to memorize and repeat their lines in court.  The art of cross-examination is more closely aligned with improvisation, and the Court's limitations would deprive Ethicon's lawyers of crucial tools they will use to present their defenses at this trial.  In an in-person trial, the Court would not impose this restraint of requiring Ethicon to collect a preset universe of exhibits for impeachment.  The Court's requirements as to impeachment in this Order therefore stand as another reason why Ethicon strenuously opposes a virtual trial which diminishes its lawyers' abilities to adapt to the evidence as presented in real time and prejudices Ethicon in this crucial aspect of its defense.

**C.      Effective contemporaneous objections during the presentation of evidence**

Section G, "Professionalism During The Trial," ¶ 3 states, in part:  "Counsel should raise a hand to signal an objection."  Doc. 200 at 12.

This is a particularly concerning requirement.  If the Court fails to notice a raised hand and the lawyer is not able to timely object, curative instructions will be less effective after the fact than would prevention of impermissible evidence from being presented to the jury.  Additionally, there will likely be no record of a raised hand if an unfortunate oversight were to occur, and this error would then be difficult to resolve, even on appeal. This particular virtual trial constraint shows the extent to which the manner of trial has become the proverbial tail wagging the dog.  The virtual trial format itself forces lawyer strategy and choice, rather than, as in a traditional trial, lawyer choice defining many contours of the presentation of evidence and style of raising objections with the Court.

**D.      Exclusion of potential jurors**

Finally, Ethicon asks the Court to revisit its previously referenced concern about potential jurors' access to technology.  *See* Order (Doc. 185 at 9).  The Court's Order, Section F, "Jurors," ¶ 1 states that, "The Court will not excuse jurors for lack of technology."  Doc. 200 at 10.  The Court may be able to make some technological provision for potential jurors, but the Court will not be able to thoroughly equip all potential jurors, especially those in rural areas with limited broadband options, with sufficient internet connection to ensure their seamless participation.

Pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.*, which governs the selection of federal juries, "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  *Id.* at § 1861.  Even prior to

the 1968 Act, the Supreme Court opined in 1946 that, "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946) (citations omitted).[18]   *See also Francis v. S. Pac. Co.*, 162 F.2d 813 (10th Cir. 1947), *aff'd*, 333 U.S. 445 (1948) (further citations omitted); *Borders v. Arch Aluminum & Glass Co.*, No. 07-2188-JPO, 2009 WL 229850, at *4 (D. Kan. Jan. 30, 2009) ("The Seventh Amendment guarantees the right of trial by a jury of one's peers in suits of common law where the value in controversy exceeds twenty dollars.  A jury of one's peers means a 'fair sampling of a cross-section of the citizenry' of the community." (citing *Henry v. State Farm Ins. Co.*, 788 F. Supp. 241, 244 (E.D. Pa. 1992)).

**III.    The Court Should Reconsider Its Order Requiring Ethicon To Pay 50% Of The Special Master Fees.**

If the Court does not change its decision to try this case by videoconference, it should at the very least reconsider its March 1, 2021 Order requiring Ethicon to pay for half Prolumina's Special Master fees.  Under Rule 53(g), the Court must decide how to allocate payment for a special master "after considering [i] the nature and amount of the controversy, [ii] the parties' means, and [iii] the extent to which any party is more responsible than other parties for the reference to a master."  Fed. R. Civ. P. 53(g)(3).  To be sure, courts have discretion to apportion the compensation of a special master among the parties.  *See, e.g.*, *Aird v. Ford Motor Co.*, 86 F.3d 216, 221 (D.C. Cir. 1996).  But the Court *must* consider the factors enumerated in Rule 53(g)(3) before allocating the costs.  And in a given case, fairness may suggest that the full expense must

---

[18] While admittedly in criminal cases, district courts have found that these concerns about juries not achieving a fair cross-section of the community warranted, or contributed to, decisions to continue trials during the pandemic.  *See, e.g.*, *United States v. Davis*, No. CR 20-MJ-00140, 2020 WL 5653332, at *1 (D. Colo. Sept. 18, 2020); *United States v. Young*, No. 19-CR-00496, 2020 WL 3963715, at *2 (D. Colo. July 13, 2020); *United States v. Fortson*, No. 2:18-CR-416, 2020 WL 4059718, at *1 (M.D. Ala. July 20, 2020).

be borne by one of the parties alone.  *See, e.g.*, *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 572 (10th Cir. 1996).

That is true here.  ***First***, civil jury trials presumptively should be held in person, and Ethicon has a constitutional right to make its case to the jury in open court and in person, face to face with witnesses and jurors, which—for the reasons outlined above—will be compromised in a video proceeding.  ***Second***, it is entirely irrelevant under Rule 53(g) whether a virtual trial would be less expensive than trying the case in person in a few short months.  The Rule does not allow costs to be apportioned to a party based on the fact that proceeding with a Special Master might ultimately be less expensive than doing so without one.

***Third***, although Plaintiffs may want to proceed via Zoom now, Ethicon consistently has objected to the videoconference format, and it cannot be held responsible for the pandemic.  In a case that has been pending for nearly a decade and concerns events that took place almost fifteen years ago, Plaintiffs' opposition to an in-person trial that will likely be possible in just a few months is the sole reason why the reference to the Special Master was deemed necessary.[19]  *Cf. La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (docket congestion, complexity, and length of time necessary for trial do not constitute exceptional circumstances justifying reference to special master).

## CONCLUSION

For the foregoing reasons, Ethicon respectfully requests that the Court reconsider its decision to try this case virtually by videoconference now, rather than briefly continuing the matter

---

[19] The Court's March 1, 2021 Order concluded that "no party is more responsible than other parties for the circumstances which require the appointment of a special master, i.e. the pandemic."  3/1/21 Order at 6. But the pandemic does not require reference to a special master; instead, it is Plaintiffs' insistence that this case proceed to trial in April rather than a few months later.

to allow for an in-person trial later this summer.  The parties will not be prejudiced by this delay.

The prejudice attendant on a virtual trial, particularly in the final emergency-status months of the

pandemic, is readily apparent.   The Court should also reconsider its decision to force Ethicon to

bear half of the fees for a Special Master to oversee Zoom trial proceedings.

Dated: March 9, 2021                              Respectfully Submitted,

/s/  Bryan E. Mouber
Bryan E. Mouber  KS #19710
Haley Ann Phillips  KS #28135
BAKER STERCHI COWDEN & RICE, L.L.C.
2400 Pershing Road, Suite 500
Kansas City, MO  64108
Telephone:     (816) 471-2121
Facsimile:     (816) 472-0288
mouber@bscr-law.com
hphillips@bscr-law.com

Matthew P. Smith (admitted *pro hac vice*)
BUTLER SNOW LLP
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
Telephone:     (615) 651-6796
Facsimile:     (615) 651-6701
Matt.Smith@butlersnow.com

Kimberly Gustafson Bueno (admitted *pro hac vice*)
BUTLER SNOW LLP
1400 Lavaca Street, Suite 1000
Austin, TX 78701
Telephone:     (737) 802-1800
Facsimile:     (737) 802-1801
kim.bueno@butlersnow.com

Caroline D. Walker (admitted *pro hac vice*)
BUTLER SNOW LLP
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, AL 35203
Telephone:     (205) 297-2220
Facsimile:     (205) 297-2201
caroline.walker@butlersnow.com

Philip J. Combs (admitted *pro hac vice)*
THOMAS COMBS & SPANN, PLLC
300 Summers Street, Suite 1380
Charleston WV 25301
Telephone:      (304) 414-1805
Facsimile:      (304) 414-1801
pcombs@tcspllc.com

Cortney G. Sylvester (admitted *pro hac vice)*
NILAN JOHNSON LEWIS P.A.
250 Marquette Avenue South, Suite 800
Minneapolis, MN  55401
Telephone:      (612) 305-7500
Facsimile:      (612) 305-7501
csylvester@nilanjohnson.com
**ATTORNEYS FOR DEFENDANTS
ETHICON, INC. and JOHNSON & JOHNSON**

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of March, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system which will send notification to all counsel of record.

/s/  Bryan E. Mouber
Attorney for Defendants

13